[Civ. No. 14514.   First Dist., Div. One.   Apr. 10, 1951.]

D. MILLS, Respondent, v. CATHERINE E. HUNTER, Appellant.

J. W. Ehrlich, Roy A. Sharff and Howard Iverson for Appellant.

Theodore M. Monell for Respondent.

PETERS, P. J.—Defendant owned a hotel in San Francisco. On December 7, 1948, she gave Milton Meyer and Company, a licensed real estate broker, a written exclusive authorization to sell such property for $75,000 for a period of 10 days. In the contract, which was partially printed and partially handwritten, appears this printed clause: "In the event of a sale hereunder by the undersigned or by MILTON MEYER & Co. during the term specified in this authorization, or any extension thereof (or within ninety days after the expiration of said term to any person with whom said MILTON MEYER & Co. has been negotiating during the term hereof), the undersigned agrees to pay on demand to said MILTON MEYER & Co., as commission, five per cent on the first $50,-000.00—plus two and one-half per cent of the balance of the purchase price." Well within the 10-day period specified in the exclusive agency, Milton Meyer and Company secured from one Phillip Langsam a written offer to buy the hotel for $71,500, and submitted this offer to defendant. The offer was rejected. On January 3, 1949, defendant sold the property to Langsam for $71,500 through another broker, and refused to pay Milton Meyer and Company a commission. That company assigned its claim to plaintiff and she brought this action to recover the commission under the 90-day clause above quoted. In her answer defendant admitted that she signed the authorization but averred that her signature was obtained through the fraud, deceit and misrepresentation of

the employees of Milton Meyer and Company; that she never read the 90-day clause and did not know that it was in the agreement; that she was induced not to read the clause by the agent of the broker who represented that the exclusive was only good for 10 days and that he had a client who was ready, able and willing to pay $75,000 for the property. The cross-complaint contains substantially the same allegations except that it is there averred that the agent of the broker expressly agreed that if the broker did not effect a sale within the 10-day period for the sum of $75,000, all rights of the broker would cease. She prays that the authorization be reformed to conform to the agreement as pleaded.

On these issues the cause proceeded to trial. The court found that defendant had signed the agreement; that her signature was not induced by any false or fraudulent representations of the employees of the broker, nor did they induce or prevent her from reading the agreement; that the 90-day provision was in the agreement, and defendant had full opportunity to read it; that the allegations of the cross-complaint in reference to an alleged agreement between defendant and the broker are untrue; that the broker and its agents did not know that defendant had not read the 90-day provision; that defendant should have known of this provision, and had full opportunity to read it. The court thereupon entered judgment for plaintiff in the sum of $3,037.50, the amount of the commission as set forth in the agreement. Defendant appeals.

Although the evidence is somewhat conflicting on the vital factual issues, there is ample and substantial evidence to support the findings of the trial court. The record shows the following:

Appellant owned the Edgeworth Hotel in San Francisco. In June of 1948 she listed the hotel for sale with the Lambert Realty Company. In October or November of 1948 Lambert showed the property to one Phillip Langsam who offered $69,000 for it. This offer appellant rejected, but she then became aware of the fact that Langsam was interested in the hotel. In November of 1948 appellant listed the property with Milton Meyer and Company for sale at $75,000, the listing being a nonexclusive open listing. This listing was secured by Kay, an employee of Milton Meyer and Company. On December 6, 1948, Phillip Langsam came into the office of Milton Meyer and Company and talked to one Miron. Langsam inquired about available hotel properties, whereupon Miron, after securing the open listing on the Edgeworth

Hotel from Kay, told Langsam about that hotel. Langsam told Miron that he knew about that property, had another broker on it, and had been unable to get it for $69,000. He did not disclose the fact that the other broker was Lambert.

On December 7, 1948, Kay and Miron called upon appellant to request from her an exclusive listing for their firm. There is some conflict as to what then occurred. Appellant testified that she was told that Milton Meyer and Company had a prospective unnamed purchaser willing to pay $75,000 for the hotel, and that the broker wanted an exclusive to close the deal. Miron testified that he told appellant that if she would give him an exclusive listing he would "try to get" $75,000 for the property. Appellant agreed to give Milton Meyer and Company a 10-day exclusive, and admittedly signed the so-called authorization to sell. This is a printed form with pertinent portions written in. The first part of the agreement gives the broker an exclusive right to sell the property for 10 days for "Seventy Five Thousand only." This is immediately followed by a handwritten general description of the property, the terms of the proposed sale, and a statement about the receipts of the hotel. This is followed, in the same size print as the rest of the portions of the agreement that are printed, by the 90-day clause quoted above. This is followed by certain handwritten matter placed in the agreement at the insistence of appellant. The signatures of Miron and appellant appear just below the second handwritten portion of the contract which follows the printed 90-day clause. The agreement is not a long complicated one. There is no "small print." The 90-day provision is in the same size print as the other printed provisions of the contract. The form is on one sheet of normal letter size paper, the two basic printed parts covering about three inches of the sheet, and the two written portions covering about the same area. The printed 90-day provision appears between the two portions of the agreement that are handwritten. Two separate copies of the agreement were executed. Appellant kept one and Miron the other.

Miron testified that appellant put on her glasses and read the agreement before she signed it, taking about five minutes for the process. This was corroborated by Kay. During the time appellant was reading the agreement neither talked to her.

Appellant admitted signing the agreement but claimed that she did not read all of it because Miron "said it wasn't

necessary,'' but just to read "what he had written in long-hand.'' She further testified that she did not read the printed 90-day clause, did not know that it was in the agreement, and would never have signed the contract had she known the 90-day provision was in it. Miron denied telling appellant not to read the printed portions of the contract, or to sign it without reading it.

After the authorization was signed on December 7, 1948, on that very same day Miron obtained from Langsam a $1,000 deposit and a written signed offer to buy the hotel for $70,-000. This offer was presented to appellant, but it is not clear whether this was done personally or by telephone. Appellant promptly rejected the offer. Thereupon, Miron went back to Langsam and got him to raise his written offer to $71,500. This was done by crossing out the figure $70,000 on the original offer and raising it to $71,500. This offer specifically stated that it was to remain open for only two days. Miron and Kay testified that Kay immediately presented this written offer to appellant. It was, of course, signed by Langsam, so that appellant then knew, if she did not know before, the person with whom Miron was negotiating. Miron testified that appellant read the offer, and both Miron and Kay testified that she firmly rejected it. Appellant denied that Miron ever presented a written offer to buy at $71,500, but this conflict was for the trial court. Langsam testified that he had made the two offers in the manner described by Miron.

After the rejection of the $71,500 offer, which occurred on December 8th or 9th, Miron tried to get Langsam to increase his offer, but was unsuccessful. He thereupon returned the $1,000 deposit, and made no further efforts to sell the hotel.

Toward the end of December, Langsam again got in touch with the Lambert Realty Company, the broker with whom he had first dealt, and after some negotiations again offered to buy the hotel for $71,500. This offer was accepted on January 3, 1949—less than a month after appellant's negotiations with Milton Meyer and Company—and the sale was consummated through Lambert Realty Company. Appellant testified that she had changed her mind about accepting $71,500 for the property because she wanted to enter another transaction that first came to her attention about December 18th.

Appellant urges that the evidence conclusively demonstrates that her signature was secured by means of the fraud and deceit of Miron and Kay. She points to her testimony that

she did not read the 90-day clause, and to her assertions that Miron told her that he had a buyer willing to pay $75,000 for the property, and that the agreement was a 10-day exclusive only, and claims that she never would have signed the agreement had these representations not been made. This testimony, however, was not believed by the trial court, and is contradicted by other witnesses. Miron testified that he would "try" to get her $75,000, and that he did so try is amply shown. There is a sharp conflict over whether appellant read the contract and over whether Miron told her not to read the printed portions. These conflicts were for the trial court. It saw and heard the witnesses and chose to believe Miron and Kay. The findings negativing fraud are amply supported. ■ This being so, this court has no power to disturb the findings.

■ Appellant next urges that the broker, to be entitled to a commission, must be the effective, efficient and procuring cause of the sale. That is undoubtedly the law as to the general authorization to sell. (*McCoy* v. *Zahn Corp.*, 183 Cal. 191 [191 P. 20] ; *Sessions* v. *Pacific Improvement Co.*, 57 Cal. App. 1 [206 P. 653].) But we are not here concerned with the rights of the broker under the general authorization to sell. ■ We are here concerned with a specific provision of the contract which expressly provided that even though the broker did not sell the property he would be entitled to a commission if appellant sold it "within ninety days after the expiration of said term to any person with whom said Milton Meyer & Co. has been negotiating during the term hereof." Under the findings, which are supported, the broker negotiated with Langsam during the 10-day term of the contract, secured a written offer from him for $71,500, communicated this offer and the name of the purchaser to appellant, and then appellant, within less than three weeks from the expiration of the 10-day term of the contract, through another broker, sold the property to Langsam for $71,500, the identical price first offered through Milton Meyer and Company. While the clause might not be applicable had the broker merely shown the property to a prospective purchaser and failed to receive an offer from him, if it is to have any meaning at all it must be held that it applies where the broker has produced a purchaser ready, able and willing to buy at a fixed price and the owner sells at that price to that purchaser within the 90-day period. We are well aware of the rule that printed contracts must be interpreted most strongly

against the party preparing the form, but that rule is of no assistance to appellant. Here the provision in question is clear, concise and unambiguous.

Appellant places her greatest reliance on the case of *Wright & Kimbrough* v. *Dewees*, 52 Cal.App. 42 [197 P. 957]. In that case the broker had a 60-day contract to sell defendant's property for $18,000. The contract contained this clause (p. 43) : "The said 'seller' agrees should a sale or exchange of said above described property upon said or any satisfactory terms be effected during the period of time hereinafter named, by either party to this agreement, or any other party, or after determination of this contract, if sold to a party to whose attention said property was brought through the agency of the said 'agent,' that the said 'agent' shall receive out of the first payment made on said property five per cent of the price for which said property was sold as a commission for promoting said sale."

Before this contract was executed the owners of the property had shown it to the Mulls, who were the ultimate purchasers, but had been unsuccessful in securing from them an offer to buy. The owners told the broker, after the listing contract was signed, that the Mulls were prospective purchasers. The broker showed the property to the Mulls but was unsuccessful in securing an offer from them. The broker informed the owners that the Mulls were no longer interested "and to forget about them as prospective purchasers." (P. 44.) On March 31, 1916, the owners cancelled the agency relationship with the broker in the manner provided in the agency contract. Thereafter, the owners again tried to interest the Mulls in the property, and, in January, 1917, about nine months after the agency contract was cancelled, sold the property to them for $12,000. The broker had nothing to do with this sale. The broker sued for a commission under the clause quoted above. At page 46 the court stated: "There is nothing in the language of this contract which takes it out of the general rule requiring the broker to be the procuring or efficient cause of the sale in order to entitle him to commissions." In referring to the purpose of the quoted provision, the court, quoting from another case, stated (p. 47) : "The only valid purpose of the stipulation in question must be to protect the broker from loss of compensation for successful efforts in procuring a purchaser, culminating in a sale on the stipulated terms after the broker's authority to effect a sale has terminated. It is a shield to protect the agent, not a sword to injure his principal."

The court pointed out that the broker was entitled to a commission, under the terms of the contract, "for promoting said sale," and held that the negotiations involved did not amount to "promoting" the sale. In this connection the court stated (p. 46) : "This language imports an obligation on the part of the broker, to entitle him to commissions, to do something more than merely show the property and make unsuccessful efforts wholly unconnected with and to no extent traceable to the subsequent sale. His commissions depended entirely upon results accomplished—for 'promoting' or procuring the sale. There is nothing in the language of this contract which takes it out of the general rule requiring the broker to be the procuring or efficient cause of the sale in order to entitle him to commissions."

This case has no application here. There, the broker was totally unsuccessful in getting the Mulls to make an offer. Here, the broker secured from Langsam a written offer to buy at $71,500, the very price at which the property was sold.

*Hobson* v. *Hunt*, 59 Cal.App. 679 [211 P. 242], another case relied upon by appellant, is also not in point. In that case the broker was granted an exclusive right to sell for two months, and thereafter, until 10 days' written notice of the cancellation. The agreement contained the following clause (p. 680) : ". . . and in the event of the said property being sold or exchanged by the owner, after the termination of this right to sell, to or by any party introduced or whose name in writing has been given the owner, as a prospective purchaser, by the agent, the owner agrees to pay the agent, as a commission, the above mentioned rate of commission on whatever price is accepted for the said property."

The agency contract was later cancelled, but, prior to the effective date of such cancellation, the broker sent the owner a list of the names of eleven prospective purchasers, including the name of the person who became the ultimate purchaser. This purchaser testified that the broker had tried to interest him in the property, but at that time he was not interested in the terms and at the price quoted. The court, in holding that the broker was not entitled to a commission, stated that the reasonable interpretation of the clause prevented such a recovery. In this connection the court held (p. 682) : "The clause in question was doubtless intended to protect the agent in the event of a sale made after the termination of the contract, to a person whom the agent had interested in the land during the life of the contract to the extent that such person had become a prospective purchaser, that is, one to whom

there was at least some probability of making a sale within a reasonable time. To construe the contract otherwise would be to hold that the agent in such a case might give the owner any number of names of persons as prospective purchasers, regardless of whether or not they were such in fact, and then, in the event of a sale to any one of them, claim the commission. It would be highly unreasonable to hold that such was the intention of the parties to the contract. It would tend to make a real estate dealer a procurer of names, rather than a procurer of purchasers.''

In the instant case, unlike the Hunt case, the broker, during the life of the contract, produced a purchaser ready, able and willing to purchase for $71,500. The contract provided that, if within 90 days the owner sold to anyone with whom the broker ''has been negotiating,'' a commission would be paid. Certainly, Milton Meyer and Company had been ''negotiating'' with Langsam during the 10-day period of the exclusive, regardless of how limited a definition is given to the term. This being so, the broker is entitled to the commission. (See, generally, *Kimmell* v. *Skelly,* 130 Cal. 555 [62 P. 1067]; *Lowe* v. *Loyd,* 93 Cal.App.2d 684 [209 P.2d 851].)

The last contention of appellant is that she was obligated to pay a commission only if the broker effectuated a sale for $75,000. In the instant case the exclusive 10-day listing was to sell the property for ''Seventy Five Thousand only.'' Of course, if during that 10-day period the broker produced a purchaser for less than $75,000, the owner was not obligated to sell or to pay a commission. But if appellant had accepted the original offer of Langsam of $71,500 procured by Milton Meyer and Company, she certainly would have been obligated to pay a commission even though $75,000 had not been secured. The 90-day provision contains no limitation as to price. It constitutes a promise to pay a commission if the owner, within 90 days, sells to anyone with whom the broker ''has been negotiating.'' Here, the sale was within that period to Langsam for the very price that Milton Meyer and Company induced Langsam to offer. Under such circumstances the $75,000 price does not limit the broker's rights.

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied May 10, 1951, and appellant's petition for a hearing by the Supreme Court was denied June 7, 1951. Carter, J., and Schauer, J., voted for a hearing.