FORD, J.—This
 

 is an appeal by the plaintiff, a licensed real estate broker, from an adverse judgment in an action to recover the amount of $4,050 under an agreement.
 

 The plaintiff relied upon an agreement bearing the date of July 5, 1956, which was stated to be for the period of July 5, 1956, to October 5, 1956, inclusive. It was provided therein that the defendant granted to the plaintiff “the exclusive and irrevocable right to sell said property within said time” for $22,500. The defendant further agreed to pay the broker ten per cent “of the selling price if said property is sold during the term hereof or any extension thereof by Broker or by me or by another broker or through any other source.” It was further stated that such percentage of the listed price would be payable to the broker if the property should be transferred during the term of the agreement or any extension thereof. In his complaint, the plaintiff alleged that the property had been sold by the defendant to Evan D. Miller and another on or about July 20, 1956, for a consideration of $40,500.
 

 The defense was two-fold in nature. That there had been a sale was denied. In addition, in a supplemental answer the
 
 *135
 
 defendant alleged that on or about August 14, 1957,
 
 [1]
 
 the property had been reconveyed to the defendant, that thereafter the parties orally agreed that the plaintiff should have a commission on any subsequent sale of the property “in consideration for the release or discharge of any claim which the plaintiff might allegedly possess,” and that on or about November 14, 1957, that agreement was fully executed in that the plaintiff received a commission of approximately $1,166.66 upon the sale of the property.
 

 The findings of the trial court were that there had been no sale during the time that the agreement of July 5, 1956, was in effect and that the allegations of the supplemental answer, to which reference has just been made, were true. The questions presented on this appeal relate to the sufficiency of the evidence to support such findings.
 

 Under the terms of the agreement, the plaintiff was given an exclusive right to sell as distinguished from a sole or exclusive agency. Accordingly, compensation would be due him pursuant to its terms if the defendant made a sale while it was in effect even though the plaintiff was not the procuring cause of such sale.
 
 (Walter
 
 v.
 
 Libby,
 
 72 Cal.App.2d 138, 141 [164 P.2d 21]; see
 
 E. A. Strout Western Realty Agency
 
 v.
 
 Gregoire,
 
 101 Cal.App.2d 512, 516-517 [225 P.2d 585];
 
 Wright
 
 v.
 
 Vernon,
 
 81 Cal.App.2d 346, 347 [183 P.2d 908]; 9 Cal.Jur. 2d, Brokers, § 94.) Under the terms of the agreement, the same result would follow from a transfer of the property by the defendant during such period.
 
 (Cf. Baumgartner
 
 v.
 
 Meek,
 
 126 Cal.App.2d 505 [272 P.2d 552].)
 

 The pertinent evidence will be summarized. It was, in some respects, rather sketchy. Mr. Rankin, the plaintiff, testified as to the efforts he had made to sell the property. In the latter part of August, 1956, an escrow for the sale of the property was opened. It was thereafter reported to him-that the defendant did not own the property and he called the matter to the defendant’s attention. A certified copy of a grant deed of the property signed by the defendant and dated July 20, 1956, was received in evidence. The grantee was a person by the name of Evan D. Miller. The certificate of acknowledgment before a notary was dated July 20, 1956. The deed had been recorded on August 24, 1956. On September 25, 1956, prior to the time that the plaintiff learned of this transfer, the defendant signed an extension of the agreement to January 1,
 
 *136
 
 1957. The defendant testified that the grant of the property was made about July 20, 1956, but he did not know the date exactly. He received nothing for the property although he was to receive a down payment of $10,000. Because of the buyer’s failure to pay him, he listed the property with Mr. Rankin. As a part of his own case, the defendant testified that he entered into the contract with Mr. Rankin
 
 after
 
 the transfer to Evan Miller. He later paid Evan Miller $500 to reacquire the property.
 

 The defendant testified as to the circumstances under which he gave a new listing to the plaintiff after the present action was filed. Such testimony was: “Q. Now, Mr. Miller, after you had re-acquired this property from Evan D. Miller, did you ever talk to Mr. Rankin regarding a compromise? A. I called Mr. Rankin and told him Evan D. Miller agreed to sign off for $500. And I went back up there, thinking that Mr. Rankin would compromise with me if I relisted—after what’s his name signed off. Anyway I went back up there and listed with him and told him. Q. Did you mention anything to him with respect to this particular lawsuit to Mr. Rankin? A. Yes. Q. What did you state to him about the lawsuit? A. Well, as I said, I wanted to compromise so as he would cancel that lawsuit, and I did that, and I did that on that account, figuring that—and I told him I didn’t want no lawsuit, because I’d rather have his friendship than to have a lawsuit, and I come back to relist that with him to avoid that ... to avoid this, and that is what I thought he had in mind. ... I sold the property, and he got that right out of it [the commission of $1,166.66 on the sale after the second listing] ; the real estate people that had furnished the buyer and sold it, they gave him that. They went up from his office and I told him what had happened, and he said, ‘Well, we will go up and talk to Mr. Rankin.’ So they went up and talked to him and they said—and then they told me that he agreed to accept that much money. The Court : Was there any agreement between you and Mr. Rankin that this was in settlement of this lawsuit? The Witness: No, sir; no, sir. I take it for granted that he would take the thousand dollars, and when I went back the second time, he didn’t have his sign on my property, he had his sign about several hundred feet off my property when he collected that money. The Court : Go ahead. Q. By Mr. Mabry:,When you went in to give Mr. Rankin an exclusive listing to sell your property, why did you do that ? A. I did that thinking that he would cancel that suit that he had
 
 *137
 
 got against me. I thought-Q. Did you ask him to do that ? A. Yes, I asked him, yes. Q. And then he accepted this listing, is that correct? A. Yes, and I thought Mr. Rankin was kind enough to do that and call it square and we’d still be good friends. That is all.” On cross-examination, he continued: “Q. When you went back to the Rankin office to relist the property, you said you thought that Mr. Rankin would cancel this lawsuit. A. That is right. Q. Did he tell you he would? A. Well, he didn’t say that he would, but-Q. He didn’t say he would? A. No, he didn’t say; I don’t remember him saying he would.”
 

 The plaintiff’s testimony upon that subject was as follows: “Q. When did you receive any money? A. After, following or subsequent sale of same property, I received one-third of the commission on the sale of this same property. Q. Now did you receive an exclusive right to sell this same property after it had been re-acquired by Mr. Miller ? A. That is right. Q. And that was of course after this action had been filed? A. That is right. Q. When did you receive this exclusive right to sell, sir ? A. I am a bit vague on dates; however, I believe the date would be later in the month of September of 1957.” Then after testifying that the sale under the second listing was a transaction in cooperation with other brokers, the plaintiff continued: “Q. By Mb. Mabry: In granting you this last exclusive, or this subsequent exclusive right to sell, was there any conversation between you and Mr. Miller regarding the compromising of this lawsuit in exchange for this exclusive right to sell? A. Prior to the granting of the exclusive right to me by Mr. Miller, Mr. Miller asked me if that could be done, a compromise on this thing. I advised him that I couldn’t. I couldn’t wash out an earned commission for the possibility of a commission, and that was the way we left it. Mr. Miller at that time had to produce monies to clear his recent escrow on the same property so that he could list the property with me for sale. This he did and when he got the vesting back in his name, he came to my office and gave me, as requested, an exclusive right to sell the same property with no consideration of washing the prior commission, that had been earned, out, because I flatly refused to him at that time to do such. Q. When you say he gave you an exclusive as requested, at whose request was this? A. I requested an exclusive right to sell the property. Q. After Mr. Miller had approached you regarding a compromise and exchange for the exclusive right to sell ? A. Mr. Miller spoke to me about a compromise. There was
 
 *138
 
 no reason why we couldn’t settle this thing. I agreed wholeheartedly. He came to my office, but made no concrete offer to settle this out of court. Only that he wished me to accept an exclusive right on property which as yet he had not received the title back in his name. He wanted me to receive that exclusive right and settle this prior claim, which I refused to do. Q. Now this was in September, you believe, of 1957? A. As nearly as I can remember, that would be close to the date. . . . Q. By Mr. Mabry: When you finally took the exclusive, did you, in any way, believe that this exclusive was given to you in exchange for a compromise? A. Not in any way and I so set forth for Mr. Miller in my—in the presence of witnesses in my office. Q. In other words, you want to say that Mr. Miller went in for a compromise, was going to give you an exclusive, you refused to have anything to do with it on that basis, but nevertheless Mr. Miller, knowing that you were suing him, just voluntarily gave you another exclusive right to sell his property ? A. I am not interpreting Mr. Miller’s feelings or his actions. Q. How much money did you receive from the sale of this property? A. Oh, some $1,100, one-third of the exclusive. I know that. Q. To be exact, you received the sum of
 
 $1,166.66;
 
 is that correct? A. That is right. ’ ’
 

 The plaintiff called Bessie Allin as a witness. She testified that the plaintiff, in reply to the request of the defendant to have the property relisted and thus dispose of the lawsuit, stated that he did not do business that way.
 

 The record supports an inference that the defendant, in good faith, disputed the claim of the plaintiff based upon the original listing agreement. Therefore, such dispute was of such a nature as to be properly the subject matter of an agreement sufficient to result in an accord and satisfaction. (See
 
 Berger
 
 v.
 
 Lane,
 
 190 Cal. 443,448 [213 P. 45].)
 

 The trial court was not required to accept the version of the plaintiff and his witness as to the circumstances surrounding the second listing agreement.
 
 (Blank
 
 v.
 
 Coffin,
 
 20 Cal.2d 457, 461 [126 P.2d 868].) The weight to be given to the testimony of the witnesses and the inferences to be drawn from the evidence were, of course, matters for the determination of the trial court. The court could reasonably infer that the plaintiff was not willing to surrender forthwith his claim under the first agreement in exchange for the mere possibility of a commission under a second listing. In other words, the plaintiff was not willing to take the hazard of a
 
 *139
 
 novation which would immediately extinguish whatever the obligation of the defendant was under the agreement of July 5,1956.
 
 (Cf. Crown Products Co.
 
 v.
 
 California Pood Products Corp.,
 
 77 Cal.App.2d 543, 549 [175 P.2d 861].) But that fact did not necessarily mean that the plaintiff had no interest in accepting a commission in settlement of the controversy in the event that such a commission, upon a subsequent sale, should become a reality rather than a mere possibility. He was aware of the reason which moved the defendant to offer him a new listing, namely, so that thereby a sale might take place and the plaintiff receive compensation and the dispute between the parties thus be resolved. With such knowledge, the plaintiff accepted the second listing and, thereafter, a commission thereunder. An inference that an agreement was in fact made may be based upon proof of conduct as well as upon proof of words.
 
 (Caron
 
 v.
 
 Andrew,
 
 133 Cal.App.2d 412, 416 [284 P.2d 550];
 
 Chandler
 
 v.
 
 Roach,
 
 156 Cal.App.2d 435, 439-440 [319 P.2d 776];
 
 Desny
 
 v.
 
 Wilder,
 
 46 Cal.2d 715, 735-737 [299 P.2d 257].) An agreement embodying an accord and satisfaction need not be an express agreement but it may be implied from circumstances. (See
 
 Lapp-Gifford Co.
 
 v.
 
 Muscoy Water Co.,
 
 166 Cal. 25, 32 [134 P. 989].) The inference to be drawn from the conduct of a person may prevail over his statements which are inconsistent with such conduct. (See
 
 Cline
 
 v.
 
 Zappettini,
 
 131 Cal.App.2d 723, 729 [281 P.2d 35].) The trial court was thus justified in reaching the conclusion that the plaintiff, by his conduct, acquiesced in the desire expressed by the defendant that an accord be reached and that the controversy be settled by the plaintiff’s receipt of compensation upon a sale under the new listing. The trier of fact was free to find that the acceptance by the plaintiff of the commission upon the sale was in satisfaction of such accord. (See
 
 Gardiner
 
 v.
 
 Gaither,
 
 162 Cal.App.2d 607, 620 [329 P.2d 22].)
 

 Since the determination of the court with respect to the defense alleged in the supplemental answer finds support in the evidence, no specific attention need be given to the trial court’s finding of fact that there had been no sale to Evan D. Miller as alleged in the complaint.
 

 The judgment is affirmed.
 

 Shinn, P. J., and Vallée, J., concurred.
 

 [1]
 

 The present action was filed May 7, 1957.