[L.A. No. 30159. In Bank. July 8, 1974.]

BEN BLANK, Plaintiff and Respondent, v.
ERICA BORDEN, Defendant and Appellant.

964

**COUNSEL**

Minsky, Garber & Rudof and Albert C. Garber for Defendant and Appellant.

James Hollowell for Plaintiff and Respondent.

Moses Lasky, Howard N. Ellman and Brobeck, Phleger & Harrison as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**SULLIVAN, J.**—In the instant case we confront the question whether the familiar withdrawal-from-sale provision in an exclusive-right-to-sell contract between an owner of real property and a real estate broker exacts an unlawful penalty within the meaning of sections 1670 and 1671 of the Civil Code. We conclude that it does not. In so holding, we decline defendant-owner's invitation to extend into this area the rule of *Fracasse* v. *Brent* (1972) 6 Cal.3d 784 [100 Cal.Rptr. 385, 494 P.2d 9], which limited to *quantum meruit* the recovery of an attorney discharged without cause in spite of a valid contingent fee contract. Pointing out basic differences between the type of contract there involved and that before us, we affirm the judgment of the trial court granting full recovery under the withdrawal-from-sale provision according to its express terms.

On April 26, 1970, defendant Erica Borden and plaintiff Ben Blank, a real estate broker, entered into a written agreement for the purpose of securing a purchaser for defendant's weekend home in Palm Springs. The agreement, a printed form contract drafted by the California Real Estate Association, was entitled "Exclusive Authorization and Right to Sell" and by its terms granted Blank the exclusive and irrevocable right to sell the property for the seven-month period extending from the date of the agreement to November 25, 1970. It further provided that if the property were sold during the said period the agent would receive 6 percent of the selling price, and that "if said property is *withdrawn from sale*, transferred, conveyed, leased without the consent of Agent, or made unmarketable by [the owner's] voluntary act during the term hereof or any extension thereof," the agent would receive 6 percent of the "price for the property" stated elsewhere in the agreement. (Italics added.) Relevant portions of the agreement are set forth in the margin.[1]

---

[1]"EXCLUSIVE AUTHORIZATION AND RIGHT TO SELL

"California Real Estate Association Standard Form

"1. RIGHT TO SELL. I hereby employ and grant *Ben Blank Company,* hereinafter called 'Agent,' the exclusive and irrevocable right to sell or exchange [the described real property] . . . .

The findings of the trial court describe subsequent events in the following terms: "5. Plaintiff at once began a diligent effort to obtain a purchaser for said property, including but not limited to the expenditures of monies for advertisements in the newspaper, but on or about June 26, 1970, while said exclusive sales contract was still in effect and while plaintiff was making a diligent effort to obtain a purchaser, defendant, without reason or justification, orally notified plaintiff that the property was no longer for sale and that he had no further right to make efforts to sell same or collect a commission, all in direct violation of said exclusive sales contract."

Determining that the foregoing constituted a withdrawal from sale within the terms of the agreement,[2] the trial court concluded that plaintiff Blank was entitled to compensation according to the agreement's provisions. Accordingly it rendered judgment in favor of plaintiff Blank in the amount of $5,100 (6 percent of $85,000) plus interest. Defendant has appealed.

---

"2. TERM. Agent's right to sell shall commence on *April 26, 1970* and expire at midnight on *November 25, 1970.*

"3. TERMS OF SALE.

"(a) The price for the property shall be the sum of *$85,000.00* . . . .

"4. COMPENSATION TO AGENT. I hereby agree to compensate Agent as follows:

"(a) *Six %* of the selling price if the property, is sold during the term hereof, or any extension thereof, by Agent, on the terms herein set forth or any other price and terms I may accept, or through any other person, or by me, or *six %* of the price shown in 3(a), if said property is withdrawn from sale, transferred, conveyed, leased without the consent of Agent, or made unmarketable by my voluntary act during the term hereof or any extension thereof.

" . . . . . . . . . . . . . .

"5. If action be instituted on this agreement to collect compensation or commissions, I agree to pay such sum as the Court may fix as reasonable attorney's fees.

" . . . . . . . . . . . . . .

"Dated *April 26, 1970* Palm Springs, California

"X [signature]

"Erica Borden, Owner

" . . . . . . . . . . . . . .

"12. In consideration of the execution of the foregoing, the undersigned Agent agrees to be diligent in endeavoring to obtain a purchaser.

"BEN BLANK COMPANY

 "Agent

"By [signature)

 "Ben Blank"

[2]Apparently the property had not been returned to the market or sold by the time of trial. Defendant testified that she and her husband were at that time using the house as their principal residence.

At the outset we quickly dispose of two contentions relating to the substantiality of the evidence in support of the findings of the trial court which we have quoted above.

█ First, it is contended that there was no support for the finding that plaintiff was making a diligent effort to find a purchaser for the property when it was withdrawn from the market; this, it is urged, resulted in a failure of consideration. Suffice it to say that although the record contains evidence which might support a contrary finding, it also contains substantial evidence in support of the finding made by the trial court concerning plaintiff's diligence. There is evidence in the record that plaintiff contacted several parties—members of the country club on whose golf course the property fronted as well as other persons—with respect to the property, and that he ran newspaper advertisements concerning the property during the two months which preceded defendant's withdrawal of the property. The fact that plaintiff had produced no *offers* prior to the withdrawal of the property from the market of course does not in itself compel a finding that he was not making diligent efforts to find a purchaser.

█ Second, it is contended that the finding concerning defendant's withdrawal of the property from the market lacks substantial support. Again, however, our examination of the record discloses ample evidence to support the finding. The withdrawal occurred in the course of an argument which took place at the property between plaintiff and defendant's then fiancé, Dr. Archer Michael.[3] Defendant was also present at the time. When Dr. Michael, after making statements which might reasonably be construed as threats of physical violence, told plaintiff to take his sign off the property and leave because his services were no longer wanted, plaintiff asked defendant whether she concurred. She replied that she did, and plaintiff departed. It was only after receiving a letter from plaintiff's attorney demanding payment pursuant to the contract that she attempted to soften her position and requested that plaintiff continue his efforts to sell the property. It was wholly within the province of the trial court, as finder of fact, to determine that the withdrawal was complete and unequivocal when made and that defendant's subsequent efforts through counsel to recant were ineffective and irrelevant.

█ We are thus brought to the single significant issue in this case, namely, the extent of recovery to which plaintiff is entitled under the contract.

---

[3]Subsequent to the events here in question but prior to judgment Dr. Michael and defendant were married.

■ It has long been the law of this state that any right to compensation asserted by a real estate broker must be found within the four corners of his employment contract. (*Crane* v. *McCormick* (1891) 92 Cal. 176, 182 [28 P. 222]; see also *Kimmell* v. *Skelly* (1900) 130 Cal. 555, 560 [62 P. 1067]; see generally, 1 Miller & Starr, Current Law of Cal. Real Estate (1965) pp. 228-247.) By the same token, however, "[t]he parties to a broker's contract for the sale of real property are at liberty to make the compensation depend upon any lawful conditions they see fit to place therein. [Citations.]" (*Leonard* v. *Fallas* (1959) 51 Cal.2d 649, 652 [335 P.2d 665].) In short it is the *contract* which governs the agent's compensation, and that contract is strictly enforced according to its lawful terms.

■ It is equally well settled in this state that a withdrawal-from-sale clause in an exclusive-right-to-sell contract is lawful and enforceable, a claim for compensation under such a clause being not a claim for damages for breach of that contract but a claim of indebtedness under its specific terms. (*Maze* v. *Gordon* (1892) 96 Cal. 61, 66-67 [30 P. 962]; *Baumgartner* v. *Meek* (1954) 126 Cal.App.2d 505, 510-511 [272 P.2d 552]; cf. *Kimmell* v. *Skelly, supra,* 130 Cal. 555, 559-561; *Rankin* v. *Miller* (1960) 179 Cal.App.2d 133, 135 [3 Cal.Rptr. 496]; see generally, 1 Miller & Starr, Current Law of Cal. Real Estate, *supra,* pp. 215, 245.)

Defendant contends, however, albeit somewhat obliquely, that such clauses should be denied enforcement as an unlawful penalty[4] under the terms of Civil Code sections 1670 and 1671. The same argument was urged upon the court in *Baumgartner* v. *Meek, supra,* 126 Cal.App.2d 505, and was rejected in the following language: "We think this contention cannot be sustained in view of the contrary holdings in the cases referred to [i.e., *Kimmell* v. *Skelly, supra,* 130 Cal. 555; *Walter* v. *Libby* (1945) 72 Cal.App.2d 138 [164 P.2d 21]; *Fleming* v. *Dolfin* (1931) 214 Cal. 269 [4 P.2d 776, 78 A.L.R. 585]; *Mills* v. *Hunter* (1951) 103 Cal.App. 2d 352 [229 P.2d 456]]. The distinction between an action for breach of the promise by the owner not to revoke or deal through others or sell himself during the stipulated term, wherein damages are sought for such breach, and a contractual provision whereby, in consideration of the services of the broker to be and being rendered, the owner directly promises that if he sells through others or by himself or revokes he will pay a sum certain, is made clear in the cited cases, particularly in the quotations

---

[4]"The term 'penalty' has traditionally been utilized to designate, inter alia, a charge which is deemed to be void because it cannot qualify as proper liquidated damages. (See *Better Food Mkts.* v. *Amer. Dist. Teleg. Co.* (1953) 40 Cal.2d 179, 184 . . . .)" (*Garrett* v. *Coast & Southern Fed. Sav. & Loan Assn.* (1973) 9 Cal.3d 731, 736, fn. 4 [108 Cal.Rptr. 845, 511 P.2d 1197].)

we have taken from the opinion in *Kimmell* v. *Skelly*. The action is for money owed, an action in debt (*Maze* v. *Gordon, supra*), and the only breach involved is the failure to pay the promised sum." (126 Cal.App.2d at p. 512.)

We agree with the *Baumgartner* court that the withdrawal-from-sale clause in an exclusive-right-to-sell contract does not constitute a void penalty provision. In reaching this conclusion we are not unmindful of the teaching of our recent decision in *Garrett* v. *Coast & Southern Fed. Sav. & Loan Assn., supra,* 9 Cal.3d 731 [108 Cal.Rptr. 845, 511 P.2d 1197], wherein we emphasized that we look to substance rather than form in determining the "true function and character" of arrangements which are challenged on this ground. (*Id.* at pp. 735-737.) As we there stated, "when it is manifest that a contract expressed to be performed in the alternative is in fact a contract contemplating but a single, definite performance with an additional charge contingent on the breach of that performance, the provision cannot escape examination in light of pertinent rules relative to the liquidation of damages." (*Id.* at p. 738.) Here, however, we do not find that the contract before us is of the indicated character. Its terms in no sense contemplate a "default" or "breach" of an obligation by the owner upon whose occurrence payment is to be made.[5] On the contrary, the clause in question presents the owner with a true option or alternative: if, during the term of an exclusive-right-to-sell contract, the owner changes his mind and decides that he does not wish to sell the subject property after all, he retains the power to terminate the agent's otherwise exclusive right through the payment of a sum certain set forth in the contract.

We do not see in this arrangement the invidious qualities characteristic of a penalty or forfeiture. As indicated above, what distinguishes the instant case from other situations in which a form of alternative performance is used to mask what is in reality a penalty or forfeiture is the element of rational choice. For an example by way of contrast we need look no further than the *Garrett* case itself. There the contract, a promissory note secured by a deed of trust on real property, provided for the assessment of certain "late charges" for failure to make timely

---

[5]Although the trial court's findings of fact and conclusions of law speak in terms of "breach" of the exclusive-right-to-sell contract, the judgment must be sustained if correct. "No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason." (*Davey* v. *Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117]; see also *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 18-19 [112 Cal.Rptr. 786, 520 P.2d 10].)

installment payments on the note—such charges to be a percentage of the unpaid principal balance for the period during which payment was in default. We held that these charges, which did not qualify as proper liquidated damages pursuant to Civil Code section 1671, constituted illegal penalties. In characterizing the subject provision we observed that its "only reasonable interpretation . . . is that the parties agreed upon the rate which should govern the contract and then, realizing that the borrowers might fail to make timely payment, they further agreed that such borrowers were to pay an additional sum as damages for their breach[,] which sum was determined by applying the increased rate to the entire unpaid principal balance." (9 Cal.3d at p. 738.) Clearly this arrangement, viewed from the time of making the contract, realistically contemplates no element of free rational choice on the part of the obligor insofar as his performance is concerned; rather the agreement is founded upon the assumption that the obligor will make the lower payment. In these circumstances, as an eminent commentator has observed, "the only purpose and effect of the formal alternative is to hold over [the obligor] the larger liability as a threat to induce prompt payment of the lesser sum." (McCormick, Damages (1935) § 154, p. 618.)

In the instant case, on the other hand, the contract clearly reserves to the owner the power to make a realistic and rational choice in the future with respect to the subject matter of the contract. Rather than allowing the broker to proceed with his efforts to sell the property, the owner, in the event that at any time during the term of the contract he changes his mind and decides not to sell after all, may withdraw the property from the market upon payment of a sum certain. In these circumstances the contract is truly one which contemplates alternative performance,[6] not one in which the formal alternative conceals a penalty for failure to perform the main promise.[7]

---

[6] See also *Buskuhl* v. *Family Life Ins. Co.* (1969) 271 Cal.App.2d 514, 521 [76 Cal.Rptr. 602]; *Bach* v. *Curry* (1968) 258 Cal.App.2d 676, 680-681 [66 Cal.Rptr. 220]; *Powis* v. *Moore Machinery Co.* (1945) 72 Cal.App.2d 344, 354-355 [164 P.2d 822].

[7] The distinction we make here is discussed by McCormick in the following terms: "[I]n . . . an alternative contract the promise to pay may be a penalty, and void as such. If a contract provides that A will either convey land then worth about $10,000 within six months at a price of $10,000 or will pay $250, it is quite clear that a reasonable man might look forward to either choice as a reasonable possibility, and there is no reason for hesitating to enforce the promise to pay if the land is not conveyed. If, on the other hand, A's promise provides that he shall either pay $100 on January 1st or $200 on demand thereafter, a different situation is presented. No reasonable man would, when the contract was made, consider that there was any rational choice involved (conceding the ability to pay either sum) in determining

Further considerations support our determination that the contractual provision here at issue should be enforced according to its terms. First, it is important to recognize that we are not here concerned with a situation wherein the party who seeks to enforce the clause enjoyed a vastly superior bargaining position at the time the contract was entered into. On the contrary, the contract before us was one which was freely negotiated by parties dealing at arm's length.[8] While contracts having characteristics of adhesion must be carefully scrutinized in order to insure that provisions therein which speak in terms of alternative performance but in fact exact a penalty are not enforced (see *Garrett* v. *Coast & Southern Fed. Sav. & Loan Assn.*, *supra*, 9 Cal.3d 731; cf. *Henningsen* v. *Bloomfield Motors, Inc.* (1960) 32 N.J. 358, 403-404 [161 A.2d 69, 75 A.L.R.2d 1]), we believe that in circumstances such as those before us interference with party autonomy is less justified. (See generally, Sweet, *Liquidated Damages in California* (1972) 60 Cal.L.Rev. 84.)

Moreover, it must be emphasized that the basic contract before us shares with other purely "commission" contracts the quality of being essentially result-oriented.[9] Regardless of the amount of effort expended by the broker under such a contract, he is entitled to no compensation at all unless a sale occurs. By the same token, when a sale *is* effected, the compensation received is a percentage of the sale price—and this is paid regardless of the amount of effort which has been expended by the broker. If in this context we view the owner's exercise of a withdrawal-from-sale clause as an anticipatory "breach" of the main contract, the "damage" sustained by the broker would not be measured in the amount of effort expended by him prior to the "breach" but rather would be measured in terms of the value of the lost *opportunity* to effect a sale and thereby

which course to pursue. If he can do so, he will pay the lesser sum, and the agreement necessarily is founded on this assumption, and the only purpose and effect of the formal alternative is to hold over him the larger liability as a threat to induce prompt payment of the lesser sum. Consequently, while an alternative promise to pay money when it presents a conceivable choice is valid, yet, if a contract is made by which a party engages himself either to do a certain act or to pay some amount which at the time of the contract no one would have considered an eligible alternative, the alternative promise to pay is unenforceable as a penalty." (McCormick, Damages, *supra*, § 154, pp. 617-618.) (Fns. omitted.)

[8]The owner of real property has a considerable range of choice as to the type of arrangement he wishes to enter into with the broker he selects to effect the sale. (See, 1 Miller & Starr, Current Law of Cal. Real Estate, *supra*, pp. 212-219.)

[9]In this respect the contract before us bears some resemblance to oil exploration contracts. With respect to the latter type of contract the difficulty of proving actual damages has led to liberal enforcement of liquidation clauses by the courts. (See Sweet, *Liquidated Damages in California, supra*, pp. 109-110.)

receive compensation. (See *Charles B. Webster Real Estate* v. *Rickard* (1971) 21 Cal.App.3d 612, 615-616 [98 Cal.Rptr. 559]; *Coleman* v. *Mora* (1968) 263 Cal.App.2d 137, 145-146 [69 Cal.Rptr. 166].) The determination of this value would clearly degenerate into an examination of fictional probabilities—e.g., whether the broker, if allowed to continue his efforts for the full term of the contract, would have been successful in locating a buyer and effecting a sale. This consideration further strengthens our conviction that in these circumstances the contract of the parties, entered into in a context of negotiation and at arm's length, should govern their rights and duties.

Finally, we reject the contention advanced· by defendant that the rule announced by us in *Fracasse* v. *Brent, supra,* 6 Cal.3d 784 [100 Cal.Rptr. 385, 494 P.2d 9] should be extended to the case at bench. In *Fracasse* we held that an attorney, retained under a valid contingent fee contract, upon discharge by his client with or without cause before the happening of the contingency, is not entitled to recover the full amount provided by the contract but only the reasonable value of his services rendered to the time of the discharge. From what we have said above it is apparent that the two types òf contract are fundamentally different. Not only do contingent fee contracts lack provisions for alternative performance such as the one which here concerns us, but it must be recognized that the circumstances under which they are executed not infrequently find the attorney in a bargaining position vastly superior to that of the client. More importantly, however, the *Fracasse* decision was clearly grounded in the special relationship of attorney and client and the public policy growing from that relationship which implies a right on the part of the client to discharge his attorney at any time with or without cause. (*Id.* at pp. 789-791.) Clearly considerations of this nature are not present in the instant case.

For the foregoing reasons we hold that the withdrawal-from-sale clause in an exclusive-right-to-sell real estate contract, long a part of real estate marketing practice in this state and long held to be valid and enforceable according to its terms, does not exact an unlawful penalty in violation of sections 1670-1671 of the Civil Code. The judgment below, which enforced the clause before us upon a showing that the explicitly stated conditions for its enforcement were present, was fully supported by the evidence and correct in all respects.

The judgment is affirmed.

Wright, C. J., McComb, J., Mosk, J., and Clark, J., concurred.

**BURKE, J.**—I dissent. The majority never reach the question whether the "commission-on-withdrawal" clause in the instant case was an invalid penalty clause or an enforceable liquidated damages clause. (See Civ. Code, §§ 1670, 1671.) Instead, the majority neatly sidestep this issue by labelling the brokerage contract as one contemplating an "alternative performance" by the owner in the event he exercises his "true option" to withdraw the property from sale. To the contrary, the issue in this case cannot be avoided by the facile use of labels—otherwise any illegal penalty could be disguised as a "true option" by the promisor to pay a substantial sum for the privilege of breaking his contract. When we examine the essential nature of the exclusive brokerage contract, it becomes patently obvious that defendant *promised* to afford plaintiff broker the exclusive and irrevocable right to sell the property during a specified period, that defendant *breached that promise* by withdrawing the property from sale, that the contract itself specifies the *damages* for that breach, and that accordingly we must determine whether or not the damage provision was a penalty or liquidated damages provision.

By the express terms of the brokerage contract, defendant gave to plaintiff "the exclusive *and irrevocable* right to sell or exchange" the subject property for the period from April 26, 1970, to November 25, 1970. (Italics added.) The proposed sales price was $85,000, and defendant agreed to pay plaintiff the following "compensation"; "Six % of the selling price if the property is sold during the term hereof, or any extension thereof, by Agent, on the terms herein set forth or any other price and terms I may accept, or through any other person, or by me, *or six % of the price shown in 3(a)* [the $85,000 sales price], *if said property is withdrawn from sale*, transferred, conveyed, leased *without consent of Agent*, or made unmarketable by my voluntary act during the term hereof or any extension thereof." (Italics added.)

Nowhere in the contract is any mention made of any "option" given to defendant to withdraw the property from sale. Instead, the language of the contract makes it apparent that a withdrawal of the property without the broker's consent would constitute a breach of the owner's promise to grant an irrevocable right to sell the property during the specified period.[1]

---

[1]The trial court found that plaintiff had made diligent efforts to sell the property and that defendant without justification withdrew the property from sale, "in direct *violation* of said exclusive sales contract." (Italics added.) Accordingly, the trial court awarded plaintiff as his "commission" the sum of $5,100, representing 6 percent of the proposed sales price of $85,000, "as provided for in said contract in the event of a *breach* of said exclusive sales contract. . . . As a result of the foregoing, plaintiff has been damaged in the sum of $5,100.00 . . . ." (Italics added.)

Indeed, it seems wholly naive to assume, as the majority do, that a property owner would have bargained for the "option" of withdrawing the property from sale, given the consequences of exercising that option, namely, the payment of the *full* commission which would have been payable to the broker had he sold the property for the original $85,000 asking price.

The majority suggest that defendant was given a "realistic and rational choice" under the contract to withdraw the property from sale, and that the contract was "freely negotiated" at "arm's length." Yet as the majority acknowledge in the first sentence of their opinion, the "commission-on-withdrawal" provision is a "familiar" one; in fact, the provision probably is contained in every exclusive brokerage contract in this state.[2] In other words, no "true option" or "rational choice" is involved in this case— owners seeking to sell their property under an exclusive contract have no practical alternative but to agree to the "commission-on-withdrawal" provision.

It is true that in 1892 this court held, in a brief, one paragraph analysis of the issue, that the "commission-on-withdrawal" provision is not a damages provision but instead merely specifies the amount to be paid the broker in the event the owner exercises his "right" to withdraw the property from sale. (*Maze* v. *Gordon*, 96 Cal. 61, 66-67 [30 P. 962].) Moreover, subsequent Court of Appeal cases have followed the *Maze* rule, albeit reluctantly. Thus, in *Baumgartner* v. *Meek*, 126 Cal.App.2d 505, 512 [272 P.2d 552], the court noted that "It is not for this court at this stage to defend or attack the [*Maze*] rationale . . . ." And in *Never* v. *King*, 276 Cal.App.2d 461, 478 [81 Cal.Rptr. 161], the court openly criticized the *Maze* and *Baumgartner* rationale, concluding, however, that it was "unnecessary to reexamine *Baumgartner*" since under the facts in *Never* the owner made no express promise to pay a commission on withdrawal. Certainly, this court should not hesitate to reexamine *Maze* in view of the hesitancy of the Court of Appeal to apply its holding.

Both the court in *Baumgartner*, and the majority herein fail to discuss another line of cases holding that an agreement to pay a broker a specified sum as "liquidated damages" in the event of a withdrawal of the

---

[2]"*The standard forms* of exclusive right to sell listings *in common use provide* . . . that the seller's withdrawal of the property from the market entitles the broker to his full commission immediately, regardless of whether he has procured a buyer before the time of the removal." (Italics added; Cal. Real Estate Transactions (Cont. Ed.Bar) § 5.18, p. 137.) As the majority herein point out, "The agreement . . . [was] a printed form contract drafted by the California Real Estate Association . . . ." (*Ante.* p. 966.)

property from sale, or other prevention of the broker's performance, is void as constituting an unlawful penalty under section 1670, at least in the absence of pleading and proof that the transaction fell within the exception contained in section 1671. (See *Robert Marsh & Co., Inc.* v. *Tremper*, 210 Cal. 572 [292 P. 950]; *McInerney* v. *Mack*, 34 Cal.App. 153 [166 P. 867]; *Glazer* v. *Hanson*, 98 Cal.App. 53 [276 P. 607]; see also Sweet, *Liquidated Damages in California*, 60 Cal.L.Rev. 84, 110-111.) The foregoing cases have never been overruled or disapproved and, I submit, their rationale is irreconcilable with the holding in *Baumgartner* and the instant case.

Thus, in *Tremper, supra,* a broker was employed to complete an exchange transaction between two principals; he was to be paid $1,000 for his services or, if the parties failed to carry out the exchange, the same amount "as liquidated damages for time, trouble and expense incurred" by the broker. The exchange fell through and the broker sought to recover $1,000 as "liquidated damages" due under the contract. The court refused such recovery, stating its rationale as follows (pp. 575-576): "The law is that the 'liquidated damage' clause is void unless it is made to appear that the case comes within the exception provided by section 1671, *supra.* The burden rests upon the person who seeks to bring himself within the exception. Upon the face of the complaint and agreement itself the provision which provides for the payment of liquidated damages is void. [¶] The items which respondent [broker] specifically names as constituting the basis of its damages, to wit, 'time, trouble and expenses incurred' in bringing about the exchange are commonplace items which enter into every contract for services and they have never been held to be impracticable or extremely difficult of determination, but, on the contrary, have been held by numerous decisions to be readily computable. [Citation.]"

The contract in *Tremper* called for the payment of "liquidated damages," whereas the contracts in *Maze, Baumgartner* and the instant case refer to payment of a "commission" or "compensation" upon the owner's withdrawal of the property from sale. Moreover, both *Maze* and *Baumgartner* assumed that since defendant-owner had a "right" to withdraw the property on payment of the specified sum, the broker's claim to that sum was not based upon breach of contract. The cases uniformly hold, however, that in determining the application of section 1670 to a particular contractual arrangement we must look beyond the form of the transaction and the stipulations of the parties. As we recently stated in *Garrett* v. *Coast & Southern Fed. Sav. & Loan Assn.,* 9 Cal.3d 731, 737 [108 Cal.Rptr. 845, 511 P.2d 1197], "We have consistently ignored form and sought

out the substance of arrangements which purport to legitimate penalties and forefeitures. [Citations.]" (See also *Robert Marsh & Co., Inc.* v. *Tremper, supra,* 210 Cal. 572, 576 [the "mere stipulations" of the contract, such as use of the phrase "liquidated damages," are not controlling].)

In *Garrett,* a case involving late charges under installment loan contracts, we analyzed and rejected a similar argument to the effect that the stipulated payment was merely part of a contract for alternative performance. We stated (pp. 737-738) in *Garrett* that "The mere fact that an agreement may be construed . . . to vest in one party an option to perform in a manner which, if it were not so construed, would result in a penalty does not validate the agreement. [Fn. omitted.] To so hold would be to condone a result which, although directly prohibited by the Legislature, may nevertheless be indirectly accomplished through the imagination of inventive minds. . . . [¶] We recognize, of course, the validity of provisions varying the acceptable performance under a contract upon the happening of a contingency. *We cannot, however, so subvert the substance of a contract to form that we lose sight of the bargained-for performance.* Thus, when it is manifest that a contract expressed to be performed in the alternative is in fact a contract contemplating but a single, definite performance with an additional charge contingent on the breach of that performance, the provision cannot escape examination in light of pertinent rules relative to the liquidation of damages. [Citations.]" (Italics added.) In *Garrett,* we concluded that the only reasonable interpretation of the late charge clause was that it was intended to provide for damages for breach in failing to make timely loan payments. Accordingly, we held that the provisions of sections 1670 and 1671 applied.[3]

As in *Garrett,* I would conclude that the only reasonable interpretation of the instant "commission upon withdrawal" clause is that it was intended to compensate the broker for damages arising from the owner's breach of the exclusive brokerage contract. Obviously, the primary purpose underlying such a contract is to afford the broker an exclusive and temporarily irrevocable right to sell the property for a specified period, unhampered by competition from other brokers and unhindered by interference from the owner. The owner's unauthorized act of withdrawing the property from sale totally defeats the foregoing purpose and, unquestionably, constitutes a breach of contract for which appropriate damages may

---

[3]See also Restatement of Contracts, section 339, comment f, to the effect that attempts to disguise a penalty provision in the form of a provision for alternative performance will not be enforced if it is clear that the promise under scrutiny was exacted solely to stimulate performance of a promise to do something else.

be recovered. Any attempt, however, to specify the amount of those damages in advance of that breach, whether termed a "commission," "liquidated damages" or otherwise, must meet the requirements of sections 1670 and 1671.

I turn, therefore, to the question whether the instant provision is a "penalty" or a "liquidated damages" provision. As we indicated in *Garrett, supra*, a penalty provision usually operates to compel the performance of an act and becomes effective only in the event of a default in that performance, upon which a forfeiture is compelled without regard to the damages which may actually flow from the failure to perform. (9 Cal.3d at p. 739.) On the other hand, a liquidated damages provision must represent a reasonable endeavor by the parties to assess the fair average compensation for a loss resulting from breach; the fixing of actual damages for a breach must have been "impracticable" or "extremely difficult." (*Id.*, at pp. 738-739.) In determining the issue, we must do so from the position of the parties at the time the contract was entered into; the party seeking to rely upon a liquidated damages provision bears the burden of pleading and proving the validity thereof under section 1671. (*Id.*, at p. 738; accord, *Better Food Mkts.* v. *Amer. Dist. Teleg. Co.*, 40 Cal.2d 179, 185 [253 P.2d 10, 42 A.L.R.2d 580].)

Judged on the basis of the foregoing rules, the "commission-upon-withdrawal" clause bears close resemblance to an ordinary penalty provision. As we have seen, in practical effect that clause operates to enforce the owner's primary promise to afford the broker an exclusive and irrevocable right to sell the subject property during the specified period; the clause only becomes effective upon the owner's breach of that promise. Moreover, the specified damages (namely, a percentage of the original asking price for the property) may bear little or no relation to the actual damages suffered by the broker upon prevention of his performance by the owner.

The specified damages could, of course, approximate actual damages in a situation in which the broker had negotiated a sale of the property at the original asking price, for in that situation the broker's actual loss would be the commission he otherwise would have earned.[4] But the "commission-upon-withdrawal" clause purports to require payment of the full commission whether or not a sale had been arranged. In that regard, the clause

---

[4] See *Never* v. *King, supra*, 276 Cal.App.2d 461, 478, and footnote 3, *ante;* see also *McInerney* v. *Mack, supra,* 34 Cal.App. 153, 157-158, and *Glazer* v. *Hanson, supra,* 98 Cal.App. 53, 60, suggesting that if the property is actually sold or exchanged, the broker's ordinary commission may properly represent the measure of his damages.

seemingly could not represent a reasonable effort to estimate the fair *average* compensation as required in *Garrett*. Moreover, as indicated in prior cases, ordinarily valuation of a broker's services is not so impracticable or extremely difficult as to justify use of a specified damages provision. (*Robert Marsh & Co., Inc.* v. *Tremper, supra,* 210 Cal. 572, 576; *McInerney* v. *Mack, supra,* 34 Cal.App. 153, 157-158; *Glazer* v. *Hanson, supra,* 98 Cal.App. 53, 60.)

However, I would leave open the question whether a "commission-upon-withdrawal" clause can ever be sustained as a valid liquidated damages provision under section 1671. (We adopted a similar approach in *Garrett, supra,* 9 Cal.3d at p. 741.) It is possible that on a proper showing we might conclude that a particular clause represents a reasonable effort by the parties to fix a fair compensation to the broker in the event the owner withdraws the property from sale. In the instant case, however, plaintiff failed to plead or prove facts which would show the applicability of section 1671, despite defendant's reliance in her answer upon the defense of unlawful penalty. Since the burden of proof was upon plaintiff in this regard, the trial court erred in awarding to him the damages specified in the brokerage contract.

Although I would hold that the contractual provision is, therefore, unenforceable in this case, plaintiff had the opportunity to establish *actual* damages arising from defendant's breach, namely, the reasonable value of plaintiff's services performed to the date the property was withdrawn from sale.[5] At trial, however, plaintiff described the nature of his services, but he made no attempt to prove by expert testimony or otherwise, the reasonable value thereof, and the trial court made no finding on that issue.

I would reverse the judgment.

Tobriner, J., concurred.

---

[5] As stated in *Garrett, supra,* "We do not hold herein that merely because the late charge provision is void and thus cannot be used in determining the lender's damages, the borrower remains unscathed. He remains liable for the actual damages resulting from his default." (9 Cal.3d at pp. 740-741.)