[No. B068914. Second Dist., Div. Three. Dec. 20, 1993.]

JOHN B. KILROY COMPANY, Plaintiff, Cross-defendant and Respondent, v.
DOUGLAS FURNITURE OF CALIFORNIA, INC., et al., Defendants Cross-complainants and Appellants;
JOHN B. KILROY, SR., et al., Cross-defendants and Respondents.

## COUNSEL

Weissmann, Wolff, Bergman, Coleman & Silverman, Ronald J. Silverman and David L. Burg for Defendants, Cross-complainants and Appellants.

Kinsella, Boesch, Fujikawa & Towle and Catherine H. Coleman for Plaintiff, Cross-defendant and Respondent and for Cross-defendants and Respondents.

## OPINION

**KLEIN, P. J.**—Defendants, cross-complainants and appellants Douglas Furniture of California, Inc., Harold E. Applebaum, Stuart A. Applebaum, Daniel Feldman, Diane Feldman, Douglas E. Cohen and Howard I. Cohen (sometimes collectively referred to as Douglas or the owners) appeal a judgment in favor of plaintiff, cross-defendant and respondent John B. Kilroy Company, and cross-defendants and respondents John B. Kilroy, Sr., and T. E. Lalonde (sometimes collectively referred to as Kilroy) following a court trial resulting in a $177,942.81 judgment for Kilroy.

The essential issue presented is whether Kilroy is entitled to a broker's commission for leases entered into between the owners and the same lessee subsequent to the expiration of the initial lease term and the option period specified in the original lease agreement.

The commission agreement was ambiguous in this regard. The trial court therefore properly received extrinsic evidence to resolve the ambiguity. Because the extrinsic evidence established Douglas agreed to pay a commission upon any modification or extension of the initial lease, and the subsequent leases constituted such an extension, Kilroy was entitled to a commission. The judgment therefore is affirmed.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

Douglas owns two parcels of industrial real property located in El Segundo (the properties) which were occupied by Douglas Furniture. In the late 1970's, having outgrown the premises, Douglas decided to relocate and lease out the properties.

In May 1978, Douglas entered into an "Exclusive Sales or Leasing Agency Contract" (the Agency Agreement) with Kilroy, a licensed real estate broker with whom Douglas had a 20-year relationship, authorizing Kilroy to procure a tenant for a commission. The Agency Agreement stated, inter alia: "We agree to pay you a full commission in accordance with the attached schedule of rates, . . ."

The attached commission schedule provided the commission would be 7 percent of the total rental for the first year, 6 percent for the second year, 5 percent for the third year, 4 percent for the fourth year and 3 percent for the fifth year. For a lease term of five years through thirty years, the commission would be 5 percent of the total rental for the first five years and 3 percent of the total rental for the balance of the term.

The commission schedule further stated: "Options to Renew or Expand. If the lease contains option rights to renew said lease and/or expand the premises, then the Commission shall be calculated as though it was part of the initial lease transaction."

Kilroy undertook to attract Hughes Aircraft Company (Hughes) as a tenant for the properties.

---

[1]We view the facts adduced at trial in the light most favorable to the judgment, giving the prevailing party the benefit of every reasonable inference and resolving conflicts in support of the judgment. (*Sanchez-Corea* v. *Bank of America* (1985) 38 Cal.3d 892, 907 [215 Cal.Rptr. 679, 701 P.2d 826]; *Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].)

Lalonde, a broker with Kilroy, advised the owners that "Hughes is . . . the type of tenant that once they move into a facility they become so ensconced as to become long term tenants." Lalonde also had conversations with the owners in which they concurred in Kilroy's understanding that Hughes's continued occupancy of the premises would be a continuation of the basic lease as opposed to a new lease.

Due to Kilroy's efforts, on January 3, 1980, the owners entered into a lease agreement with Hughes for the properties. The lease term was a period of five years, commencing January 1, 1980, and ending December 31, 1984. The lease agreement contained an option to extend the lease for a five-year period following the expiration of the initial term. The lease agreement further stated: "LESSEE shall have no other right to extend the term beyond the extended term."

Before paying the commission, Harold Applebaum, one of the owners, requested the commission be characterized as a consultation fee rather than as a commission, so that the amount could be paid by Douglas as an operation expense for tax purposes, instead of being paid by the individual owners/lessors. Kilroy had no objection to the request but was concerned about the potential for misunderstanding as to future commissions if the original commission were characterized as a consultation fee.

Consequently, on May 1, 1980, Lalonde sent Douglas the following letter: "In order to keep the records of the John B. Kilroy Company current, the following will indicate the status of the commission due for leasing 1920 and 1925 E. Maple only. The John B. Kilroy Company will receive a commission for services rendered as follows: [¶] $32,030/month (base rental) × 60 months × 5% = $96,090 [¶] It is understood the referenced commission agreement should be applicable to any modifications or extensions of the lease. [¶] If you are in agreement with this understanding, please acknowledge in the space provided below."

On May 6, 1980, Applebaum on behalf of the owners acknowledged and accepted the letter by signing in the space provided.

Around that time, Douglas paid Kilroy $96,090, representing the commission due for the 1980 lease.

In 1985, Hughes exercised its option under the lease to extend the lease through December 31, 1989. Consistent with the Agency Agreement, Douglas paid Kilroy another commission in the amount of $72,600.

Hughes elected not to exercise its option under the lease to purchase the properties. Instead, at the end of the five-year option period in December

1989, Hughes and the owners signed separate lease agreements for each of the two buildings. Kilroy was not involved in those lease negotiations. The terms of the leases were for five years, ending December 31, 1994, with options for four successive thirty-month periods.

Douglas refused to pay the commissions Kilroy claimed were owing as a result of the 1989 lease agreements. Kilroy then brought this action against Douglas to recover the commissions.

Douglas filed a cross-complaint against Kilroy for breach of fiduciary duty. The cross-complaint alleged: The owners did not wish to sell the premises and they granted Hughes an option in the lease to purchase the premises only at the insistence of Hughes, a desirable tenant. They repeatedly advised Kilroy they did not wish to sell the premises. Despite the owners' expressed preference, Lalonde contacted Hughes to inquire whether he could assist Hughes in exercising the purchase option. There were no actual damages because Hughes elected not to exercise the purchase option. However, the owners sought nominal and punitive damages.

The matter was tried before the court without a jury over a two-day period. The witnesses at trial were Lalonde; Alan A. Herd, an expert witness for Kilroy; Daniel Feldman, vice-president of Douglas; and Kenneth Lockwood Simpson, Douglas's expert.

The trial court issued an extensive statement of decision, which provided, inter alia: The language of the Agency Agreement provides for the payment of commissions from the owners to Kilroy for a period of up to 30 years after Kilroy procured a tenant. Kilroy procured Hughes as a tenant. Even before Hughes signed the lease, the parties to the Agency Agreement mutually understood Hughes was likely to be a long-term tenant and was likely to remain in the premises even if it chose not to exercise the purchase option. On May 6, 1980, the owners acknowledged and accepted in writing the mutual understanding of the owners and Kilroy that the Agency Agreement " 'should be applicable to any extensions or modifications of the lease' " between the owners and Hughes.

The trial court further found the documents the owners and Hughes executed in 1989 constituted an extension or modification of the 1980 lease. The two lease documents signed by the owners and Hughes in 1989 were identical in most respects, and similar in all other material respects, to the 1980 lease. The 1989 documents describe the same tenant, same landlord (with the exception of one owner who died), and the same premises as the 1980 lease. The intent of the owners and Kilroy, as reflected in the Agency

Agreement, and as confirmed in the May 1, 1980 letter, was that Kilroy would continue to be paid commissions as long as the owners and Kilroy maintained the lessor/lessee relationship for the properties, up to a maximum of 30 years. The services Kilroy was to perform under the Agency Agreement were fully performed when the 1980 lease was signed and Hughes was installed as a tenant. The Agency Agreement entitles Kilroy to continuing commissions for initially bringing Hughes and the owners together.

The trial court also found against the owners on their claim for breach of fiduciary duty. It held none of Kilroy's contact with Hughes during the summer and fall of 1988 constituted a breach of any fiduciary duty Kilroy owed the owners at that time. There was no evidence any contact between Hughes and Kilroy was made in contravention of any instructions given by the owners to Kilroy. Even assuming there were a breach of fiduciary duty, there was no evidence such breach was the proximate cause of any damage to the owners. Finally, there was no evidence of oppressive, fraudulent or malicious conduct which would support a claim for punitive damages.

The trial court entered judgment for Kilroy in the sum of $131,199.48 plus $31,815.83 in interest, for a total of $163,015.31, plus costs in the sum of $14,927.50.

This appeal followed.

## CONTENTIONS

Douglas contends: (1) this court must interpret the Agency Agreement de novo because the trial court's interpretation did not turn upon the credibility of extrinsic evidence; (2) any right of Kilroy to receive commissions for the two 1990 leases must have been stated expressly within the four corners of the Agency Agreement; (3) Kilroy is not entitled to receive commissions for the two 1990 leases; and (4) Kilroy breached its fiduciary duty to the owners.

## DISCUSSION

1. *General principles.*

   a. *Interpretation of written instrument.*

■ "The interpretation of a written instrument is a judicial function to be exercised according to the generally accepted canons of interpretation, unless the interpretation turns upon the credibility of extrinsic evidence. When

the interpretation turns on a credibility determination, interpretation becomes a question of fact. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 . . . .) When the contract is unambiguous, an appellate court is not bound by the trial court's interpretation of the contract. [Citations.] However, when the meaning of a contract is uncertain, and contradictory evidence is introduced to aid in the interpretation, the question of meaning is one of fact properly assigned to the fact finder and its findings should not be disturbed by the appellate tribunal. [Citation.]" (*Sunniland Fruit, Inc.* v. *Verni* (1991) 233 Cal.App.3d 892, 898 [284 Cal.Rptr. 824].)

■ Under the parol evidence rule, while extrinsic evidence is inadmissible "to add to, detract from, or vary the terms of a written contract, these terms must first be determined before it can be decided whether or not extrinsic evidence is being offered for a prohibited purpose. The fact that the terms of an instrument appear clear to a judge does not preclude the possibility that the parties chose the language of the instrument to express different terms. . . . [¶] Accordingly, rational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties. [Fn. omitted.] [Citations.] . . . If the court decides, after considering this evidence, that the language of a contract, in the light of all the circumstances, 'is fairly susceptible of either one of the two interpretations contended for' . . . , extrinsic evidence relevant to prove either of such meanings is admissible. [Fn. omitted.]" (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 39-40 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]; accord, *Banco do Brasil, S.A.* v. *Latian, Inc.* (1991) 234 Cal.App.3d 973, 1008 [285 Cal.Rptr. 870].)

As discussed below, the trial court properly received extrinsic evidence to interpret the ambiguous Agency Agreement. Because the trial court's determination rested in part on the credibility of extrinsic evidence, the question of meaning was one of fact for the trial court. Our scope of review is guided by these principles.

b. *Broker's right to compensation.*

■ "It has long been the law of this state that any right to compensation asserted by a real estate broker must be found within the four corners of his [or her] employment contract. [Citations.] By the same token, however, '[t]he parties to a broker's contract . . . are at liberty to make the compensation depend upon any lawful conditions they see fit to place therein. [Citations.]' [Citation.] In short it is the *contract* which governs the agent's compensation, and that contract is strictly enforced according to its lawful

terms." (*Blank* v. *Borden* (1974) 11 Cal.3d 963, 969 [115 Cal.Rptr. 31, 524 P.2d 127].)

> *2. Trial court properly received extrinsic evidence because Agency Agreement is ambiguous as to Kilroy's entitlement to a commission for any continued occupancy by a tenant originally procured by Kilroy.*

As indicated, the Agency Agreement subscribed by Douglas stated, inter alia: "We agree to pay you a full commission in accordance with the attached schedule of rates, . . ." The attached commission schedule provided the commission would be 7 percent of the total rental for the first year, declining to 3 percent of the total rental for the fifth year. For a lease term of five years through thirty years, the commission would be 5 percent of the total rental for the first five years and 3 percent of the total rental for the balance of the term.

■  In view of the fact the Agency Agreement contemplated the payment of commissions for up to 30 years, and did not expressly limit the commission to the initial lease agreement between the owners and Hughes, an ambiguity exists as to the nature and extent of Kilroy's entitlement to a commission.

The commission schedule further stated: "Options to Renew or Expand. If the lease contains option rights to renew said lease and/or expand the premises, then the Commission shall be calculated as though it was part of the initial lease transaction."

This provision creates another ambiguity. Douglas argues this provision sets forth the precise and exclusive circumstances under which Kilroy would be entitled to receive an additional commission for any subsequent occupancy by a tenant originally procured by Kilroy, over and above the commission due to Kilroy for initially procuring the tenant. However, an alternative interpretation is plausible. This provision reasonably may be construed as simply giving the lessor a break on the commission for the extended period. Instead of reverting back to the 7 percent commission that applied for the first year of the lease, the extended period is treated as merely an addition to the original lease term, resulting in a reduced commission rate.

In light of these ambiguities, the trial court properly received extrinsic evidence to determine the meaning of the Agency Agreement.

> *3. Extrinsic evidence established Kilroy's entitlement to a commission for any modifications or extensions of the lease for up to 30 years.*

Because the Agency Agreement was ambiguous, the trial court's resort to extrinsic evidence was proper.

The extrinsic evidence included, inter alia, the May 1, 1980, letter from Kilroy to Douglas, which document was subscribed by Applebaum on behalf of the owners. As indicated, the May 1, 1980, letter stated in relevant part: "It is understood the referenced commission agreement should be applicable to *any modifications or extensions* of the lease." (Italics added.)

Accordingly, the trial court properly held "[t]he true intention of the Owners and Kilroy, as reflected in the Agency Agreement, and as confirmed in the letter of May 1, 1980," was that Kilroy would continue to earn commissions "upon any modifications or extensions" of the lease executed between the owners and Hughes.

The parties to a broker's contract are at liberty to make the compensation depend upon any lawful conditions they see fit. (*Blank* v. *Borden, supra,* 11 Cal.3d at p. 969.) Thus, in *Reynolds* v. *Tufts* (1970) 123 Ga.App. 147 [179 S.E.2d 652], a leasing agent was allowed to recover a commission on rent paid under a new lease contract between the lessor and the lessee to which the agent was not a party. The original lease provided for a 5 percent commission on all rentals paid by lessee to lessor " '*whether paid under this lease or not.*' " (*Id.,* 179 S.E.2d at p. 653.) At the expiration, the lessee did not exercise a renewal option but instead negotiated a new lease directly with the lessor for enlarged premises at a higher rental. No further commissions were paid to the agent. (*Ibid.*) The lessor contended the original lease was not renewed and the agent had no part in procuring the new lease. (*Ibid.*)

*Reynolds* found for the agent, holding the contract "clearly contemplates that as long as the two named parties maintain the lessor-lessee relationship for the described premises as shown in the original lease the agent will be entitled to continuing commissions for bringing them together initially." (*Reynolds* v. *Tufts, supra,* 179 S.E.2d at p. 653; see also *Rosenblum* v. *Lurie* (1937) 412 Pa. 255 [194 A. 204] [lessor agreed to pay broker commission upon " 'the total rentals received' . . . 'during the entire life of the lease . . . and any renewals thereof.' "].)

Here, the Agency Agreement between Douglas and Kilroy similarly contemplates continuing commissions for bringing the parties together. Because Douglas agreed to pay commissions upon any extensions or modifications of the original lease, the trial court did not err in holding Kilroy is entitled to continuing commissions for Hughes's tenancy for up to 30 years.

4. *Trial court properly held the documents the owners and Hughes executed in 1989 constituted an " 'extension or modification' " of the lease signed in 1980.*

The remaining issue is whether the 1989 leases were an extension or modification of the original lease.

In this regard, Kilroy's expert, Herd, testified the 1989 leases were merely an extension of the preceding lease because the 1989 leases involved the same tenants, the same landlord, the same premises, and the tenants' occupancy was continuous. Also, the buildings were being put to the same use as under the original lease. There were no material changes between the original lease and the new leases which would create a new lease as opposed to a renewal of the existing lease.

Herd's analysis is consistent with case law from other jurisdictions. In *Wm. P. Zinn & Co.* v. *Shawnee Pottery Company* (D.C.Ohio 1955) 148 F.Supp. 322, 323-325, prior to the expiration of the original term, the landlord and tenant cancelled leases providing for optional renewals and entered into a new lease for the identical properties with only minor changes. Consequently, the court concluded the new lease merely was a renewal of the original lease. (*Id.*, 179 S.E.2d at p. 324.) Therefore, the broker was entitled to a commission under the agency agreement, which agreement provided for a commission on the " 'rental payments under said lease . . . including any renewals[.]' " (*Ibid.*)

In *Consolidated Realty Co.* v. *Graves* (1942) 291 Ky. 456 [165 S.W.2d 26, 30], the court took a similar approach, stating ". . . real estate owners [may not] deprive the brokers or agents of their commission by simply entering into a new contract with the buyer or lessee cancelling the contract resulting from the services or efforts of the agent, and entering into a contract of sale or lease for a different price or consideration."

Accordingly, by the same rationale, the trial court here properly held the 1989 leases constituted an extension or modification of the original lease within the meaning of the Agency Agreement rather than a new lease.[2]

5. *Douglas's contention re breach of fiduciary duty without merit.*

Douglas contends Kilroy violated its fiduciary obligations to the owners by attempting to induce Hughes to exercise the purchase option. Douglas avers Lalonde knew from the outset the owners strongly desired to retain

[2]In arguing the new leases were not a modification or extension of the original lease, the owners also point to the provision in the 1980 lease that "LESSEE shall have no . . . right to extend the term" of the lease, beyond the single five-year option period specified in that lease. Therefore, according to the owners, the 1980 lease expired by its terms at the end of 1989.

However, this provision does not establish the 1989 leases were new leases rather than an extension of the original lease. The provision merely precluded the lessee from unilaterally extending the lease beyond the initial option period. It did not prevent the owners and Hughes from extending the lease further by mutual agreement, which is what occurred here.

ownership of the properties and they acceded to the purchase option in 1980 lease only because Lalonde expressly represented Hughes was absolutely inflexible in its demand for such a provision. Nevertheless, in blatant disregard of the owners' instructions to Kilroy, and of Kilroy's fiduciary duty to the owners, in 1988 Lalonde engaged in a deliberate effort to induce Hughes to exercise the purchase option.

The contention is without merit. In rejecting Douglas's claim for breach of fiduciary duty, the trial court specifically found "[t]here is no evidence that any contact between Hughes and [Kilroy] was made in contravention of any instructions given from the Owners to Kilroy." Douglas does not challenge the sufficiency of the evidence to support this finding. The contention therefore is waived.

## DISPOSITION

The judgment is affirmed. Kilroy to recover costs on appeal.

Croskey, J., and Hinz, J., concurred.