# IN THE SUPREME COURT OF CALIFORNIA

JJD-HOV ELK GROVE, LLC,

Plaintiff and Appellant,

v.

JO-ANN STORES, LLC,

Defendant and Respondent.

S275843

Third Appellate District
C094190

Sacramento County Superior Court
34-2019-00248163-CU-BC-GDS

December 19, 2024

Justice Evans authored the opinion of the Court, in which
Chief Justice Guerrero and Justices Corrigan, Liu, Kruger,
Groban, and Jenkins concurred.

JJD-HOV ELK GROVE, LLC v. JO-ANN STORES, LLC

S275843

Opinion of the Court by Evans, J.

A cotenancy provision is a feature found in some commercial retail leases. These provisions typically allow retailers to pay reduced rent or terminate the lease when the number of anchor tenants (large retailers that are attractive to a broad range of shoppers) or the overall occupancy level of retailers in a shopping center falls below a specific threshold. Generally, courts endeavor to enforce contracts as the parties have written them. California Civil Code section 1671, however, prohibits the enforcement of liquidated damages provisions when they operate as unreasonable penalties for contractual breach.[1] The issue in this case is whether a cotenancy provision that allows the tenant to pay a reduced rent when a shopping center's number of anchor tenants or occupancy level of retailers falls below a specific threshold is valid as an alternative performance of the contract or whether it is a penalty subject to section 1671's reasonability limitation.

For the reasons discussed below, we affirm the judgment of the Court of Appeal and uphold the cotenancy provision in this case as reflecting the parties' agreement regarding acceptable alternative performance of agreed upon contract obligations.

---

[1]     All further statutory references are to the Civil Code.

1

## I.   COTENANCY PROVISIONS BACKGROUND

Cotenancy clauses condition a retail tenant's opening or operating of its business on whether other tenant businesses in a specific shopping center are also open for business.  (Retail Leasing:  Drafting and Negotiating the Lease (Cont.Ed.Bar 2023 supp.) Cotenancy Requirements, § 7.1 (Retail Leasing).)  These clauses, which are typically only found in retail leases, provide the tenant with the option to pay reduced rent, or occasionally to terminate the lease, should the provision's specified tenancy levels for the shopping center not be met.  (*Ibid*.; 5 Thompson on Real Property, Thomas eds. (2024) § 44.14(b)(1) (Thompson on Real Property).)  Even if "[l]andlords do not usually control the events that lead to vacancies within shopping centers and therefore resist being bound by cotenancy requirements," a "knowledgeable tenant may request that a landlord incorporate the clause" into the lease to protect a tenant's financial viability should the shopping center not be utilized to its full capacity. (Retail Leasing, *supra*, § 7.1.)

Anchor tenants greatly impact the economic viability of other retail tenants in a shopping center by attracting customers.  (Thompson on Real Property, *supra*, § 44.14(b)(1).)  Cotenancy provisions assure a retail tenant that other tenants and, in particular, anchor tenants, will be open for businesses. (*Ibid*.; Retail Leasing § 7.1.)  These provisions are typically a result of extended negotiations between a landlord and tenant, who tend to be sophisticated and well-represented.  (Thompson on Real Property*, supra,* § 44.14(b)(2).)  Cotenancy provisions generally include the following provisions:  (1) specific named cotenants and occupancy levels, (2) any right the landlord has to cure a failure to satisfy a cotenancy provision, and (3) any

remedies the tenant has should a cotenancy provision not be satisfied. (*Id.,* § 44.14(b)(3).)

Historically, when interpreting cotenancy agreements, courts have applied the general contract principle that, absent unconscionability or significant public policy concerns, contracts should be enforced as written and agreed upon by the parties. (See *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 ["The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. (Civ. Code, § 1636.) If contractual language is clear and explicit, it governs. (*Id.*, § 1638.)"][2]; see also *Estate of Bodger* (1955) 130 Cal.App.2d 416, 425 (*Bodger*) [" 'It is not the province of the Court to alter a contract by construction or to make a new contract for the parties; its duty is confined to the interpretation of the one which they have made for themselves, and, in the absence of any ground for denying enforcement, to enforcing or giving effect to the contract as made, that is, to enforce or give effect to the contract as made without regard to its wisdom or folly, [or] to the apparent unreasonableness of its terms . . .' "]; Thompson on Real Property, *supra*, § 44.14(b)(4) ["Courts generally appear to enforce cotenancy provisions when called upon to do so"].) While few California cases have interpreted cotenancy provisions (see *Grand Prospect Partners, L.P. v. Ross Dress For Less, Inc.* (2015) 232 Cal.App.4th 1332, 1336 (*Grand Prospect*) [noting that as of

---

[2]    See sections 1636 and 1638. Section 1636 provides: "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (§ 1636.) Section 1638 provides: "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." (§ 1638.)

2015, "[t]he enforceability of cotenancy provisions has not been discussed in an opinion published by a California appellate court"]), in the vast majority of cases from other jurisdictions, courts have upheld these provisions.[3]

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Landlord JJD-HOV Elk Grove (JJD) owns a shopping center in Elk Grove, California.  Jo-Ann Stores, LLC (Jo-Ann), a national fabric and craft chain store, leased approximately

---

[3]     These cases include *Boca Park Marketplace Syndications Grp., LLC v. Ross Dress for Less, Inc.* (D.Nev., June 20, 2019, No. 2:16-cv-01197-RFB-PAL) 2019 WL 2563814 (*Boca Park*) (upholding provision allowing tenant to pay "Substitute Rent" of two percent of gross sales in lieu of "Minimum Rent" if cotenancy requirement not met, in part because the extensive negotiations between the sophisticated parties demonstrated they "understood that they were negotiating and agreed to a contract with different benefits and risks for each party"); *Kleban Holding Co., LLC v. Ann Taylor Retail, Inc.* (D.Conn., Nov. 26, 2013, 3:11-CV-01879 (VLB)) 2013 U.S. Dist. Lexis 168231 (upholding cotenancy provision allowing tenant to pay reduced rent of five percent of gross sales if either specific anchor tenant or 50 percent of other retail space in mall were not open); *Hickory Grove, LLC v. Rack Room Shoes, Inc.* (E.D.Tenn., May 21, 2012, 1:10-cv-290) 2012 U.S. Dist. Lexis 70353 (upholding cotenancy provision allowing tenant to pay reduced rent of four percent of gross sales if various cotenancy requirements failed); and *Old Navy, LLC v. Ctr. Devs. Oreg, LLC* (D.Or., June 13, 2012, 3:11-472-KI) 2012 U.S. Dist. Lexis 82579 (upholding cotenancy provision allowing tenant to pay "Alternate Rent Remedy" equal to lesser of two percent of gross sales or the "Minimum Rent then applicable" if cotenancy requirement not met and finding "the Alternate Rent Remedy is not a liquidated damages provision").

35,000 square feet of retail space in JJD's shopping center.[4]  Jo-Ann's lease was for 10 years, starting in September 2004 with four options to extend the lease for five years each.  The lease provided two different calculations of rent:  "Fixed Minimum Rent," which was initially $36,458 per month (with an increase every five years and totaling $42,292 at the commencement of the litigation), or "Substitute Rent" (totaling the greater of three and one-half percent of Jo-Ann's gross sales of all goods and services minus pattern sales or $12,000 per month).

This case concerns the Substitute Rent clause of Jo-Ann's lease, which is triggered when the lease's cotenancy provision is not satisfied.  The cotenancy provision states:  "To induce Tenant to enter into this Lease . . . Landlord represents that it has entered into or shall enter into binding leases . . . for the use and occupancy of either:  (x) [three so-called 'anchor tenants' or comparable substitutes] . . . or (y) sixty percent (60%) or more of the gross leasable area of the Shopping Center (excluding the Premises)."  The cotenancy provision can be satisfied only by anchor tenants that are open for business.  If the cotenancy provision is not satisfied for a period of six months, Jo-Ann has the option either to "continue its tenancy . . . subject to the obligation to pay only Substitute Rent until the satisfaction of the co-tenancy requirement" or to terminate the lease.  The cotenancy agreement was the result of extended negotiations by the parties, both of whom were represented by counsel.  Little

---

[4]    The lease was executed by JJD's predecessor in interest (Elk Grove Marketplace, LLC, or EGM) and Jo-Ann's predecessor in interest (FCA of Ohio, Inc.).  JJD became the successor in interest to EGM in 2007 and Jo-Ann became the successor in interest to FCA in 2014.

evidence, however, has been produced about the specific details of those negotiations.[5]

Jo-Ann invoked the cotenancy provision twice prior to the dispute that commenced this litigation. Jo-Ann first paid Substitute Rent for several months in late 2004 and early 2005, before the anchor tenants opened for business. In 2007, Jo-Ann again paid Substitute Rent after Sacramento Food Cooperative, an anchor tenant, was replaced by Grocery Outlet. Jo-Ann's 2007 invocation of Substitute Rent resulted in litigation over whether Grocery Outlet was a comparable substitute tenant within the meaning of the cotenancy provision. That litigation did not involve a dispute over whether the Substitute Rent provision was enforceable. In the course of that litigation, JJD acknowledged that Jo-Ann may pay Substitute Rent when the cotenancy provision is not satisfied. The dispute over comparable substitute tenants was ultimately settled and neither party waived its respective contentions regarding how the cotenancy provision was defined or satisfied.

---

[5]  Available evidence shows that Jo-Ann initially proposed that Substitute Rent would be either three percent of sales or $2,000 per month, but that amount was finalized as three and one-half percent of sales or $12,000 per month. The parties also discussed whether the occupancy threshold should be 60 percent, 70 percent, or 80 percent of the gross leasable area of the shopping center, with 60 percent being the finalized amount. The original lease did not identify anchor tenants but was later amended by the parties to indicate that Sports Chalet and Sacramento Food Cooperative would be two of the three anchor tenants. The lease was also modified to decrease the anchor tenants' square footage occupancy requirement from 72,000 square feet to 68,000 square feet.

This case comes to us after Jo-Ann invoked the Substitute Rent Clause for a third time. In July 2018, Jo-Ann informed JJD it intended to pay Substitute Rent because two anchor tenants, Sports Chalet and Toys "R" Us, closed. These closures reduced the shopping center's retail occupancy below 60 percent, meaning that the cotenancy provision was no longer satisfied. Jo-Ann continued to pay Substitute Rent for approximately 20 months until May 2020, when Scandinavian Designs opened in the former Toys "R" Us space, satisfying the cotenancy provision. (It appears Jo-Ann reverted to paying Fixed Minimum Rent for a brief period in 2018 when Halloween Superstore temporarily opened in the former Sports Chalet location, pushing the shopping center's occupancy over 60 percent.)

In 2015, the Court of Appeal for the Fifth Appellate District held in *Grand Prospect*, *supra*, 232 Cal.App.4th 1332, that a different cotenancy provision operated as an unenforceable penalty. Following Jo-Ann's 2018 decision to pay JJD Substitute Rent, JJD filed a complaint against Jo-Ann for declaratory relief and breach of contract, arguing that the parties' cotenancy provision is an unenforceable penalty under *Grand Prospect*. JJD requested a judicial declaration that the cotenancy provision is an unenforceable penalty and thus Jo-Ann has always been obligated to pay Fixed Minimum Rent. JJD contends that Jo-Ann owes it $638,293 — the difference between Substitute Rent and Fixed Minimum Rent for all three periods where Jo-Ann paid Substitute Rent — plus interest. Jo-Ann filed a cross-complaint against JJD seeking a judicial declaration that the parties' cotenancy provision is valid and enforceable. The parties filed cross-motions for summary judgment. The trial court ruled for Jo-Ann, finding that *Grand*

*Prospect* was factually distinguishable and that the cotenancy provision with JJD was an alternative rent structure, rather than a penalty. The Court of Appeal for the Third Appellate District affirmed. (*JJD-HOV Elk Grove, LLC v. Jo-Ann Stores, LLC* (2022) 80 Cal.App.5th 409, 420–426 (*JJD*).) We granted review to determine whether the Court of Appeal erred in upholding the cotenancy provision.

## III. DISCUSSION

We are tasked with determining, as an initial matter, whether the cotenancy provision here should be evaluated under an alternative performance rubric or under liquidated damages breach of contract principles. We hold that the *JJD* court properly analyzed the cotenancy provision as a form of alternative performance. The cotenancy provision allocates risks and benefits between the two parties and provides JJD a realistic choice between accepting lower rent or taking additional efforts to increase occupancy rates or secure replacement anchor tenants. (See *Blank v. Borden* (1974) 11 Cal.3d 963, 971 (*Blank*).) *Grand Prospect*, on which landlord JJD relies, is distinguishable on the facts and its reasoning does not apply to the case at hand. We also assess whether section 3275, which concerns forfeiture in response to contractual breach, applies to the facts of this case. Similar to section 1671, section 3275 would not apply even if JJD had raised or adequately developed the argument below, because compliance with the cotenancy provision does not constitute a breach-induced forfeiture. Accordingly, traditional contract interpretation norms govern, and the contract should be enforced as written.

## A. The Parties Satisfied the Contract Through Alternative Performance

According to JJD, the cotenancy provision is not a method of alternative performance but rather a penalty. In Jo-Ann's view, and that of the Court of Appeal, the cotenancy provision is enforceable as written. The Court of Appeal reasoned that the lease and cotenancy provision simply created a rent scheme in which there are two applicable rents. (*JJD, supra*, 80 Cal.App.5th at p. 425.) The court determined that the triggering of the cotenancy provision and Jo-Ann's subsequent payment of Substitute Rent was an alternative form of compliance with the lease as explicitly spelled out in the lease terms, rather than a contractual breach (or its functional equivalent).

We agree with Jo-Ann and the court below. *Blank, supra,* 11 Cal.3d at p. 971 creates the framework used by courts when assessing whether a cotenancy provision provides a valid form of alternative performance. When assessing contractual provisions like the one at hand, courts consider the substance of a provision over its form. (*Garrett v. Coast & Southern Fed. Sav. & Loan Assn.* (1973) 9 Cal.3d 731, 737 (*Garrett*).) We engage in a two-step inquiry to determine whether a provision that facially provides for alternative performance functions as an unenforceable penalty. Courts first apply the "realistic and rational choice" test of *Blank, supra,* 11 Cal.3d at p. 971, to determine whether the provision substantively establishes methods of alternative performance or instead provides for liquidated damages. "Where 'the contract clearly reserves to the owner the power to make a realistic and rational choice in the future with respect to the subject matter of the contract,' a valid alternative performance provision will be found. . . . On the other hand, where the 'arrangement, viewed from the time of

making the contract, realistically contemplates no element of free rational choice on the part of the obligor insofar as his performance is concerned . . . ,' the provision will be deemed to provide for a penalty." (*McGuire v. More-Gas Investments, LLC* (2013) 220 Cal.App.4th 512, 523 (*McGuire)*, quoting *Blank, supra*, 11 Cal.3d at p. 971.) As *Blank* instructs, where a reasonable person would consider the "formal" contractual choice merely a threat to induce performance rather than an "eligible alternative," the provision serves as a penalty. (*Blank, supra*, 11 Cal.3d at p. 971, fn. 7.)

If the provision establishes methods for alternative performance, the inquiry ends, and the provision is valid. (See *Cellphone Termination Fee Cases* (2011) 193 Cal.App.4th 298, 328 ["A contractual provision that merely provides an option of alternative performance of an obligation does not impose damages and is not subject to section 1671 limitations"].) In contrast, if the provision provides for liquidated damages, courts apply section 1671. In this case, we reach only the first step of this inquiry. Since the cotenancy provision provides for alternative performance under *Blank,* section 1671 does not apply.

The cotenancy provision before us fits into this established alternative performance framework. (See *McGuire, supra,* 220 Cal.App.4th at p. 522 ["[A] provision in a contract that appears at first glance to be either a liquidated damages clause or an unenforceable penalty provision may instead merely be a provision that permissibly calls for alternative performance by the obligor"].) The cotenancy provision "clearly reserves to [JJD] the power to make a realistic and rational choice." (*Blank, supra*, 11 Cal.3d at p. 971.) JJD can choose to provide a higher level of service (i.e., a mall with anchor tenants or specified

occupancy levels) and receive a higher rental amount, or alternatively, to provide a reduced level of service (i.e., a mall with reduced anchor tenants or occupancy levels) and receive a reduced rental amount. Because tenants are receiving less value for the leases they are locked in to, it is reasonable for the parties to agree to lower rent payments for the reduced value of services.

Depending on the circumstances, either course of action might be preferable to a landlord like JJD. In fact, before *Grand Prospect* was decided, JJD or its predecessor accepted Substitute Rent, did not dispute the enforceability of the cotenancy provision, and did not seek to renegotiate it when Jo-Ann's lease was up for extension.

If JJD wishes to avoid receiving a lower level of rent, it can choose to make inducements to attract additional anchor tenants or raise the overall occupancy rate. These efforts may include offering favorable lease terms, providing additional amenities to tenants, or renegotiating important leases. The totality of the relevant economic circumstances here belies JJD's characterization of the clause as a penalty. The cotenancy provision does not "realistically contemplate[] no element of free rational choice on the part of the obligor insofar as his performance is concerned." (*Blank*, *supra*, 11 Cal.3d at p. 971, fn. 7.) Rather, JJD has a credible choice between two alternative methods of contractual performance, which are clearly designated in the duly negotiated contract.

Moreover, cotenancy provisions are not negotiated in a vacuum. The parties — who are often sophisticated and well-represented — consider such provisions alongside other lease terms during an arms-length negotiation process. The

bargaining power of the parties, their ability to rigorously negotiate contract terms with the assistance of counsel, their understanding of the real estate market, familiarity with how cotenancy lease provisions work, and ability to walk away from the bargaining table should the contract negotiations not meet with their approval, all inform what it means for the parties to have made a "realistic and rational choice" in entering a lease agreement in light of economic realities.

While a cotenancy provision standing alone may seem disadvantageous to one party or the other, its inclusion in the lease may be the result of one party acquiescing to less-desirable terms elsewhere in the lease. JJD ignores the possibility that cotenancy provisions may exist to entice retailers into rental agreements, giving them a level of ameliorative protection should the shopping center's other retailers close, reducing foot traffic and sales. (See Thompson on Real Property, *supra*, § 44.14(b)(1) ["Anchor tenants attract customers to the shopping center . . . No retail tenant wants to be stuck in a shopping center filled with vacant stores"].) These considerations likewise bear on whether contractual parties had a "realistic and rational choice" in entering the lease agreement.

JJD argues that the cotenancy provision is unenforceable because the provision's condition precedent is triggered by the actions of a *third* party — that is, other tenants (or lack of tenants) who rent out retail space — rather than by a party to the lease. According to JJD, it has no options to ensure compliance. While it is true that a tenant's departure from the shopping center is not an affirmative action taken by JJD, JJD maintains some level of control over the occupancy rates in the shopping center. For example, JJD is not restricted from offering incentives to potential tenants to move into or not

12

abandon available retail spaces.  In fact, JJD's lease with Jo-Ann explicitly leverages its cotenancy provision as an incentive for "induc[ing] Tenant to enter this Lease."

Contracts exist to allocate risk between parties.  (*Southern California School of Theology v. Claremont Graduate University* (2021) 60 Cal.App.5th 1, 10; see *Kanovsky v. At Your Door Self Storage* (2019) 42 Cal.App.5th 594, 598 ["Allowing parties to allocate risk for mutual benefit has advantages"].)  Cotenancy provisions benefit both parties; they allow the landlord to court tenants, and they protect tenants should the landlord provide a reduced level of service.  The commercially sophisticated parties here mutually negotiated a cotenancy provision that accounted for the risk of reduced occupancy levels, outlined specific measures for what would happen if that were to occur, and provided the landlord the choice of accepting lower rent in lieu of taking the steps necessary to retain or attract tenants.

### B. *Grand Prospect* Does Not Support JJD's Claim That the Cotenancy Provision Is an Unreasonable Penalty

JJD argues that under *Grand Prospect*, *supra*, 232 Cal.App.4th 1332, the cotenancy provision in this case is an unenforceable penalty.  JJD's reliance on *Grand Prospect* is misplaced.  Applying the *Blank* framework, the *Grand Prospect* court determined that the shopping center landlord had no realistic and rational choice about whether the retailer invoked the rent abatement provision at issue because, viewed from the time of contracting, the landlord lacked control over the specified anchor tenant and its property.  In contrast, JJD retained control over the property at issue and thus arguably had the ability to satisfy the cotenancy provision.

13

In *Grand Prospect*, the Court of Appeal held that a cotenancy provision was an unenforceable penalty. (*Grand Prospect, supra*, 232 Cal.App.4th at pp. 1336–1337.) In reaching this conclusion, the court noted that there is no general rule that cotenancy provisions are per se unreasonable and thus unenforceable penalties. (*Id.* at p. 1344.) However, applying *Blank*, the court determined that the specific cotenancy provision at issue was a penalty. And applying an analysis informed by cases interpreting section 1671, the court determined that the cotenancy provision at issue functioned as an unreasonable penalty, and was therefore unenforceable.

The case involved a shopping center owner, Grand Prospect Partners, L.P. (Grand Prospect), and national retail chain Ross Dress For Less, Inc. (Ross). After extensive negotiations between the parties, Ross signed a lease for retail space to open a new Ross location in Grand Prospect's shopping center. (*Grand Prospect, supra*, 232 Cal.App.4th at pp. 1339–1340.) The lease included a cotenancy provision that allowed Ross to delay its store opening and to pay no rent if there was no acceptable anchor tenant open at the time the lease commenced. (*Id.* at pp. 1339–1340, 1344–1345.) The parties agreed that the then-open department store, Mervyn's, was an acceptable anchor tenant and expressly conditioned Ross's opening on Mervyn's continued operation in the shopping center. (*Id.* at p. 1340.) The parties also agreed that if Mervyn's ceased operations and was not replaced by an acceptable anchor tenant within twelve months, Ross would be able to terminate the lease. (*Id.* at p. 1337.)

After Grand Prospect finished preparing the retail space but before Ross took possession of it, Mervyn's filed for bankruptcy and closed its location in the shopping center.

(*Grand Prospect, supra*, 232 Cal.App.4th at p. 1337.)  Grand Prospect had no control over Mervyn's tenancy.  Mervyn's owned its own building and Grand Prospect was not its landlord.  (*Id.* at p. 1341, fn. 2.)[6]

As permitted by the terms of the lease, Ross accepted delivery of the retail premises, but did not open a store or pay rent.  (*Id.* at p. 1341.)  No new anchor tenant moved into the space previously occupied by Mervyn's, and Ross exited the lease at the end of a twelve-month period as permitted by the lease without ever having paid rent or opened a store.  (*Ibid.*)

Concluding that the landlord did not control Mervyn's actions, the court summarily rejected the characterization of the cotenancy provision as providing for alternative performance. (*Grand Prospect, supra*, 232 Cal.App.4th at p. 1358.)  Instead, the court viewed the cotenancy provision as one specifying liquidated damages for a breach and proceeded to analyze whether the asserted damages were an unreasonable penalty. "Under California law, the characteristic feature of a penalty is the lack of a proportional relationship between the forfeiture compelled and the damages or harm that might actually flow from the failure to perform a covenant or satisfy a condition." (*Id.*, citing *Ridgley v. Topa Thrift & Loan Assn.* (1998) 17 Cal.4th 970, 977 (*Ridgley*).)  The court held that a penalty is unenforceable when it " 'bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow' from a breach of a covenant or a failure of a

---

[6]    After Mervyn's closed its store, Grand Prospect purchased the building and subsequently leased it, although not in a manner that satisfied the cotenancy provision. (*Grand Prospect, supra,* 232 Cal.App.4th at p. 1341, fn. 2.)

15

condition." (*Grand Prospect*, *supra*, 232 Cal.App.4th. at p. 1358, quoting *Greentree Financial Group, Inc. v. Execute Sports, Inc.* (2008) 163 Cal.App.4th 495, 497 (*Greentree*).) In crafting this rule, the *Grand Prospect* court relied on cases that apply section 1671 following a breach of contract.[7] (*Grand Prospect*, *supra*, 232 Cal.App.4th. at pp. 1355–1358.)

While we express no view on the validity of *Grand Prospect*'s holding, we note that the cotenancy provision in *Grand Prospect* is readily distinguishable from the cotenancy provision in the case at hand. Although the contracts in both cases were duly negotiated by the parties, the terms of the cotenancy provision in this case provide JJD a "realistic and rational choice" between alternative methods of performance. The *Grand Prospect* court noted that, under *Blank*, where a

---

[7] These cases are *Beasley v. Wells Fargo Bank* (1991) 235 Cal.App.3d 1383 (late payments and credit usage over a customer's credit limit could be analyzed under § 1671); *Harbor Island Holdings v. Kim* (2003) 107 Cal.App.4th 790 (commercial lease that included a provision that would double rent payments if the tenant breached the lease was an unenforceable penalty under § 1671); *Garrett*, *supra*, 9 Cal.3d 731 (late payment charges applied to loan repayments were penalties under § 1671); *McGuire v. More-Gas Investments, LLC* (2013) 220 Cal.App.4th 512 (breach of contract case discussing § 1671 remanded to include further examination of alternative performance); *Fox Chicago Realty Corp. v. Zukor's Dresses, Inc.* (1942) 50 Cal.App.2d 129 (lease amendment that created lower rent but required full back payment of rent if renter defaulted on a payment was an unenforceable penalty under § 1671); *Ridgley*, *supra*, 17 Cal.4th 970 (loan prepayment fee triggered by late interest payment was an unenforceable penalty under § 1671); and *Greentree*, *supra*, 163 Cal.App.4th 495 (contract provision requiring payment of settlement in full if payer was late on installment payments was unenforceable penalty under § 1671).

"contract provision . . . provides a party with a true alternative performance — that is, an alternative that provides a rational choice between two reasonable possibilities — [it] does not involve an unenforceable penalty." (*Grand Prospect, supra*, 232 Cal.App.4th at p. 1358.)  However, as applied, "the conditions contained in the Lease . . . did not provide Grand Prospect with an alternative performance because, at the time the Lease was made, Grand Prospect did not own the space or have any opportunity to affect, much less control, Mervyn's decision to cease its operations." (*Id*.)  Because the cotenancy provision conditioned Ross's opening on Mervyn's continued operation in the shopping center, but "Grand Prospect had no control over whether Mervyn's continued to operate in the shopping center," the court deemed the provision a penalty subject to enforceability analysis.  (*Id*. at pp. 1358, 1340, fn. 2.)

The facts of *Grand Prospect* are distinguishable from *JJD*.  Unlike in *Grand Prospect*, the cotenancy provision at issue in *JJD* offers the landlord a "realistic and rational choice" regarding future performance.  (*Blank, supra*, 11 Cal.3d at p. 971.)  The cotenancy provision condition at issue here did not condition the level of rent on the continued occupancy of a specific anchor tenant whose actions the landlord had no "opportunity to affect."  (*Grand Prospect, supra*, 2323 Cal.App.4th at p. 1358.)  As the owner of the space and the anchor tenants' landlord, JJD had "control" over which method of alternative performance to pursue.  As discussed above, the landlord could take steps to minimize vacancies, such as by offering additional amenities and incentives or by renegotiating leases with important tenants.  In fact, JJD and its predecessor previously cured conditions triggering Jo-Ann's right to pay Substitute Rent during the multiyear tenancy.  Alternatively,

the landlord could choose to accept a higher vacancy rate and receive a lower rent from tenants with relevant cotenancy provisions. Thus, the cotenancy provision at issue here provided a "realistic and rational choice" between alternative ways of performing under the lease agreement. The cotenancy provision in this case is thus factually distinguishable from the provision the *Grand Prospect* court held was a penalty under *Blank's* alternative performance framework.

In light of the parties' compliance with the lease through alternative performance, the Court of Appeal below properly applied general contract interpretation norms to assess the validity of the cotenancy provision. These norms favor leaving contracts intact and unamended by the courts. (*JJD, supra*, 80 Cal.App.5th at pp. 422–423; see *Bodger*, *supra*, 130 Cal.App.2d at p. 425 [courts should enforce contracts even when specific terms could be deemed unreasonable].) As noted extensively throughout this litigation, JJD and Jo-Ann were sophisticated, represented parties who duly negotiated a lease, including a detailed cotenancy provision. (*JJD, supra*, 80 Cal.App.5th at p. 426.) JJD knowingly agreed to these terms when it signed the lease with Jo-Ann. (*Ibid.*) The parties should continue to be bound by those lease terms.

## C. The Parties Complied with the Contract and Thus Section 3275 Does Not Apply

JJD contends that section 3275, which protects against forfeiture, requires Jo-Ann to pay Fixed Minimum Rent at all times. JJD forfeited its section 3275 argument, because it failed to raise the argument in the trial court or to meaningfully develop it in the Court of Appeal. (*People v. Rundle* (2008) 43 Cal.4th 76, 123; *JJD, supra*, 80 Cal.App.5th at p. 422 ["Other than quoting Civil Code section 3275, both in its brief and at oral

argument, JJD never discusses that statute or explains its applicability to this case.  Moreover, it was not cited in the trial court by the parties, or in the trial court's decision"].)  But even absent forfeiture, this claim would be meritless.

Under section 3275, a party that incurs a forfeiture by failing to comply with a contractual provision can, in some cases, raise section 3275 as an "equitable defense" to enforcement of a contractual provision.  (*Ridgley*, *supra*, 17 Cal.4th at p. 976.)

Landlord JJD, having received reduced rent payments under the cotenancy provision it agreed to, has not suffered a forfeiture.  As discussed above, the parties agreed to two different options for paying rent and for promoting foot traffic in the shopping center by ensuring that other retailers were open.  The cotenancy provision agreed to by the parties provides the landlord viable options that correlate the amount of rent received by the landlord with the level of benefits the landlord provides its tenants.  Section 3275 does not apply to this case, because adhering to the cotenancy provision is a form of compliance with the contract and thus does not constitute a breach-induced forfeiture.  And, even if it did, JJD does not claim that it has provided the "full compensation" to Jo-Ann that would entitle it to relief under the statute.  (*Ridgley*, *supra*, 17 Cal.4th at p. 976.)

The *Grand Prospect* court, assessing the cotenancy provision that applied to Grand Prospect and Ross, held "if a conditional provision in a contract constitutes an illegal penalty, then the affected party 'incurs a forfeiture' for purposes of Civil Code section 3275 and 'may be relieved therefrom.' " (*Grand Prospect, supra*, 232 Cal.App.4th at p. 1365.)  The court's forfeiture analysis was predicated on a finding that the

cotenancy provision at issue was an unenforceable penalty. As discussed above, the cotenancy provision in this case is not a penalty; it is a duly negotiated contract term providing for alternative performance, and thus does not implicate section 3275.

JJD relies on *Ridgley*, *supra*, 17 Cal.4th 970, to support its argument that it is being punished for taking a discretionary act under the contract and thus has suffered an unreasonable forfeiture under section 3275. In *Ridgley*, we held that a fee triggered by late interest payments that was also assessed when paying off a loan early was an unreasonable penalty under section 1671. (*Ridgley*, *supra*, 17 Cal.4th 970.) The fee resulted in the forfeiture of the paying party's ability to pay back the loan without an unfair penalty. (*Id.* at p. 980.) Normally, a prepayment fee would be considered a form of alternative performance. (*Id.* at p. 978.) However, the prepayment fee in *Ridgley*, conditioned on late interest payments, was designed to pressure the paying party to make timely payments, rather than compensate the lender for any harm from a late payment. (*Id.* at pp. 980–981.)

Contractual provisions negotiated by commercially sophisticated parties may constitute unreasonable penalties or result in unreasonable forfeitures. (*Ridgley, supra,* 17 Cal.4th at p. 981, fn. 5 [rejecting the argument that "a different set of rules must apply [to section 1671 and section 3275 analysis] because this was an 'arm's-length commercial transaction.' "].) Represented, sophisticated parties are not exempt from *Ridgley* or section 3275 analysis.

In this case, however, *Ridgley* does not support JJD's argument. First, unlike the provision in *Ridgley*, the contract

provision here is not "logically unrelated" to the provision's purpose. (*Ridgley, supra,* 17 Cal.4th at p. 981.) Logically, the cotenancy provision provides for different rental amounts based on the level of services provided to the tenant. It does not operate as an unreasonable penalty. Second, Jo-Ann's compliance has not resulted in a forfeiture for JJD; JJD is simply receiving a reduced payment for the reduced level of services it is providing Jo-Ann.

## D. Application of Traditional Contract Norms

Since neither section 1671 nor section 3275 applies to the facts here, the lower court's reliance on the general rule for interpreting contracts was proper. "[T]he parties' contractual intent when reduced to writing should be controlling and enforced, particularly as applied to the commercial leasing market in arms-length negotiations and transactions." (*JJD, supra,* 80 Cal.App.5th at p. 422.) Applying this rule to the cotenancy provision in the present case, we hold that the cotenancy provision is valid and enforceable.

"Contracts are, by their very nature, allocations of risk and responsibility as between the parties." (*Southern California School of Theology, supra,* 60 Cal.App.5th at p. 10.) It is not the place of courts to invalidate a contractual term when one party benefits or suffers commercial harm. As the Court of Appeal below succinctly stated: "[T]he parties considered and agreed to allocate the risk of reduced occupancy to JJD, and agreed JJD would receive substantially reduced rent if that risk occurred. JJD has received precisely the Substitute Rent it agreed to receive." (*JJD, supra,* 80 Cal.App.5th at p. 426.) We decline to alter that agreement.

## IV.    DISPOSITION

We affirm the judgment of the Court of Appeal.


**EVANS, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  JJD-HOV Elk Grove, LLC v. Jo-Ann Stores, LLC

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 80 Cal.App.5th 409
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S275843
**Date Filed:**  December 19, 2024

_____

**Court:**  Superior
**County:**  Sacramento
**Judge:**  Shama Hakim Mesiwala

_____

**Counsel:**

Whitney, Thompson & Jeffcoach, Marshall C. Whitney and Jacob S. Sarabian for Plaintiff and Appellant.

DLA Piper, Mark E. McKeen and Eva K. Schueller for Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jacob S. Sarabian
Whitney, Thompson & Jeffcoach LLP
970 West Alluvial Avenue
Fresno, CA 93711
(559) 753-2550

Mark E. McKeen
DLA Piper LLP (US)
555 Mission Street, Suite 2400
San Francisco, CA 94105
(415) 615-6096